[No. E008603. Fourth Dist., Div. Two. Oct. 16, 1991.]

ABBA RUBBER COMPANY, Plaintiff and Respondent, v.
ROY J. SEAQUIST et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts C and D.

## COUNSEL

Weil, Patronite & Cederstrom and Janice M. Patronite for Defendants and Appellants.

Ervin, Cohen & Jessup, Gabriel, Herman & Peretz, Allan Gabriel and Natalie C. Ziontz for Plaintiff and Respondent.

## Opinion

**McKINSTER, J.**—In an action concerning the alleged misappropriation of trade secrets, the trial court issued a preliminary injunction, restraining the defendants from soliciting any former customers of the plaintiff. The defendants challenge the plaintiff's entitlement to injunctive relief, the form and scope of the injunction, and the adequacy of the amount of the undertaking specified by the trial court. Concluding that the injunction is vague and that the amount of the undertaking is insufficient, we reverse the order.

### Factual Background

Roy J. Seaquist began manufacturing rubber rollers under the name of ABBA Rubber Company in 1959. He sold the business in 1980. The plaintiff bought the business in 1982.

J.T. "Jose" Uribe began working at ABBA in 1973. He remained there through the various changes of ownership, rising to vice-president and general manager in 1987. His brother, J.A. "Tony" Uribe began working for the company in 1985, and later was promoted to sales manager. In these capacities, both Uribes became very familiar with the identities of ABBA's customers.

Meanwhile, Mr. Seaquist had started a metal fabrication business known as Seaquist Company (Seaquist). In 1985, following the expiration of the noncompetition clause in the agreement by which he had sold ABBA, Seaquist also began manufacturing rubber roller products. However, it had no sales force, and did not significantly expand.

On September 11, 1989, Jose Uribe either quit or was fired from ABBA. The same day, he was hired by Seaquist, which simultaneously leased a new building from which to operate an expanded rubber roller business. Several weeks later, Seaquist hired Tony Uribe as a salesman. He had been fired by the plaintiff in early 1989, and since then had been working for yet another manufacturer of rubber rollers.

While the Uribes deny taking any records from ABBA, they admit to soliciting business from some ABBA customers. They did this in part by means of a letter which announced Jose Uribe's relocation from ABBA to Seaquist, and which invited the recipient to contact him regarding Seaquist's "ability to provide . . . an advantage in price, quality and service."

### Procedural Background

The plaintiff filed a complaint on June 13, 1990, which alleged misappropriation of trade secrets, unfair competition, intentional inference with

business relations, breach of contract, and other theories. It named as defendants Mr. Seaquist, Jose Uribe, and Tony Uribe, and prayed for preliminary and permanent injunctive relief and damages.

Six days later, the plaintiff made an ex parte application for a temporary restraining order (TRO) and for an order to the defendants to show cause why a preliminary injunction should not issue. Ultimately, the trial court denied the application for the TRO, but granted the application for the preliminary injunction. The preliminary injunction was signed on August 20, 1990, and issued on August 24, 1990, when the plaintiff filed the requisite $1,000 undertaking.

The injunction restrained the defendants from engaging in any of the following acts:

"1. Further solicitation of business from any of the recipients of the September 15, 1989 solicitation letter sent by defendants;

"2. Solicitation of business from any person or entity who has purchased rubber rollers from ABBA between January 1, 1989 and August 7, 1990, and who was on the ABBA customer list as of September 11, 1989 (hereafter referred to as 'ABBA customers'), or facilitating any other person or entity's solicitation of ABBA customers; and

"3. Divulging, making known or making any use whatsoever of the trade secrets of ABBA, concerning the customers subject to the restraints set forth in paragraph 2 of this Preliminary Injunction, which trade secrets consist of:

"(a) the names of ABBA customers;

"(b) the contact persons for ABBA customers, their addresses and telephone numbers;

"(c) the amounts and types of rubber rollers purchased from ABBA by ABBA customers;

"(d) the dates on which each ABBA customer last purchased rubber rollers from ABBA;

"(e) information as to when each ABBA customer opened its account with ABBA; and

"(f) any other information relating to ABBA customers' needs and anticipated needs as communicated to ABBA by these customers."

## CONTENTIONS

The defendants contend that the trial court abused its discretion in issuing the injunction, because the identity of the plaintiff's customers was not a trade secret. They also attack the form of the injunction, on the grounds that it does not allow them to determine, in advance and with certainty, what conduct is permissible and what conduct is prohibited. Similarly, they contend that the injunction is impermissibly overbroad, because it proscribes the solicitation of businesses which are not customers of the plaintiff or the identities of which are otherwise not secret. Finally, they assert that the amount of the undertaking specified in the injunction is inadequate.

We conclude that the undertaking is insufficient, and therefore reverse the trial court's order granting the preliminary injunction. For the guidance of the trial court and the parties in the event that any further injunctions, either preliminary or permanent, are issued in this matter, we also address the defendants' contentions concerning the merits, form, and scope of the injunction.

## DISCUSSION

### A. IS THE UNDERTAKING TOO LOW?

Prior to the issuance of the minute order in which the trial court announced its decision on the application for the preliminary injunction, neither the plaintiff nor the defendants had addressed the issues of either the requirement for or the amount of the undertaking to be posted by the plaintiff in the event that the plaintiff's application was granted.[1] Not surprisingly, therefore, the minute order was silent on the need for or amount of any undertaking. Thereafter, the plaintiff submitted a proposed preliminary injunction, which also had no provision for any undertaking.

While no hearing was held concerning the form of the order, the defendants submitted to the judge written objections to the form proposed by the plaintiff. Those objections raised the lack of any provision for an undertaking, and proposed the sum of $315,000, based upon the evidence which the plaintiff had previously submitted concerning Seaquist's income from former customers of the plaintiff. The plaintiff responded that the defendants

---

[1]The closest that either party came to raising those issues was the plaintiff's submission, two days before the hearing, of a copy of the preliminary injunction issued by a different trial court in another case involving allegations of misappropriations of trade secret customer lists. While that injunction had been conditioned upon the posting of a bond in the sum of only $1,000, it was not offered on that point, but solely as an example of the description of the acts to be enjoined.

had waived their right to "request" an undertaking, and that in any event an undertaking was not required. As an aside, it noted that an undertaking of only $1,000 had been specified in the exemplar which it had provided to the court. The trial court amended the form of order proposed by the plaintiff by adding the requirement of a $1,000 undertaking, and signed the injunction.

On appeal, the defendants renew their objection to the lack of a sufficient bond.

### 1. Did the Defendants Waive Their Objection?

As its initial response to the defendants' attack on the amount of the undertaking, the plaintiff again contends that the objection has been waived. Specifically, the plaintiff argues, without authority, that they waived their right to make such a challenge because they failed to raise the issue prior to the issuance of the trial court's ruling on the application for the preliminary injunction. Although not specifically raised by the plaintiff, we also consider whether a waiver resulted from the defendants' failure to contest the adequacy of the undertaking by a noticed motion.

### a. No Waiver by Failing to Request Undertaking in Advance.

■ The conditioning of the issuance of a preliminary injunction upon the posting of an undertaking is statutorily required: "On granting an injunction, the court or judge *must* require an undertaking on the part of the applicant. . . ." (Code Civ. Proc.,[2] § 529, subd. (a), italics added.) That duty is mandatory, not discretionary. (*Neumann* v. *Moretti* (1905) 146 Cal. 31, 33 [79 P. 512].) Nothing in the statute conditions the trial court's obligation to require such an undertaking upon a request from the parties. To the contrary, an injunction does not become effective until an undertaking is required and furnished (*Griffin* v. *Lima* (1954) 124 Cal.App.2d 697, 699 [269 P.2d 191]), and must be dissolved if an undertaking is not filed within the time allowed by statute (§ 529, subd. (a)). Since an undertaking is an indispensable prerequisite to the issuance of a preliminary injunction, regardless of whether the party to be restrained has reminded the court to require the applicant to post one, the restrained party does not waive its right to that statutorily mandated protection by failing to affirmatively request it. Therefore, the defendants' initial silence did not waive their right to an undertaking.

---

[2]Unless specified otherwise, all further statutory references are to the Code of Civil Procedure.

Furthermore, the defendants are entitled, not merely to any undertaking, but to an undertaking in an amount sufficient to pay the defendants "such damages . . . as [they] may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (§ 529, subd. (a).) Once again, this is an obligation imposed upon the trial court by statute, independent of any request from the party to be restrained. Therefore, the mere fact that the defendants did not expressly demand, prior to the time that the trial court took the plaintiff's application for preliminary injunction under submission, that any such injunction be conditioned upon the posting of a sufficient undertaking, did not result in a waiver of their right to challenge the amount of the subsequent undertaking.

b. *No Waiver by Failing to File a Motion.*

A closer issue is whether such a waiver occurred because the defendants failed to strictly comply with the statutory procedure governing objections to the amounts of undertakings.[3]

The Bond and Undertaking Law, enacted in 1982, applies to all bonds[4] "given as security pursuant to any statute of this state, except to the extent the statute prescribes a different rule or is inconsistent." (§§ 995.010 and 995.020, subd. (a).) Article 9 of that law, comprised of sections 995.910 through 995.960, "governs objections to a bond given in an action or proceeding." (§ 995.910.) An "objection" includes a contention that "[t]he amount of the bond is insufficient." (§ 995.920, subd. (b).) Thus, that article governed the challenge being made here, concerning the amount of the undertaking to be given in this action pursuant to section 529.

Section 995.930 prescribes the manner in which such an objection is to be made: "(a) An objection shall be in writing and shall be made by noticed motion. The notice of motion shall specify the precise grounds for the objection. If a ground for the objection is that the amount of the bond is insufficient, the notice of motion shall state the reason for the insufficiency and shall include an estimate of the amount that would be sufficient.

"(b) The objection shall be made within 10 days after service of a copy of the bond on the beneficiary or such other time as is required by the statute providing for the bond.

"(c) If no objection is made within the time required by statute, the beneficiary is deemed to have waived all objections except upon a showing

---

[3]As noted, the plaintiff did not initially raise this omission as the manner in which the alleged waiver had occurred. However, after we pointed out the issue in a request for further briefing, it enthusiastically embraced that argument.

[4]The law speaks primarily in terms of bonds, because it defines that term to include undertakings. (§ 995.140, subd. (a)(2).)

of good cause for failure to make the objection within the time required by statute or of changed circumstances."

Obviously, the means used by the defendants here to communicate their objection to the trial court—an ex parte objection rather than a noticed motion—did not comply with the letter of those statutory procedures. Were they nevertheless sufficient to prevent the waiver threatened by section 995.930, subdivision (c)?

■ "Unless the intent of the statute can only be served by demanding strict compliance with its terms, substantial compliance is the governing test." (*Downtown Palo Alto Com. For Fair Assessment v. City Council* (1986) 180 Cal.App.3d 384, 394 [225 Cal.Rptr. 559].) "Substantial compliance . . . means actual compliance in respect to the substance essential to every reasonable objective of the statute." (*Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649], italics omitted.) Thus, we consider the purposes of the objection procedure described by section 995.930.

■ Since the purpose of the procedures specified in this section has not previously been judicially determined, we analogize to an objection statute which has received extensive judicial attention: Evidence Code section 353, which requires that any evidentiary objection be timely made and specifically stated. The objectives of those requirements are to prevent error by the trial court and to avoid unfair surprise to opposing parties. (*People v. Morris* (1991) 53 Cal.3d 152, 187-188 [279 Cal.Rptr. 720, 807 P.2d 949].) Compliance with the statute furthers those twin objectives in two ways. First, it gives the trial judge "a concrete legal proposition to pass on . . . ." (*Bundy v. Sierra Lumber Co.* (1906) 149 Cal. 772, 776 [87 P. 622].) Second, it advises opposing counsel of the alleged defect, to afford him the opportunity to reframe or withdraw the question (*ibid.*), "lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal" on appeal (*People v. Morris, supra,* 53 Cal.3d at p. 188).

■ The objection procedure outlined by section 995.930 has similar objectives: to reduce the likelihood that the trial court will persist in an erroneous failure to comply with its duty to require the posting of a sufficient bond; and to do so in a way which will provide sufficient notice to the opposing side to meaningfully respond. It seeks to accomplish these goals in a variety of ways. For instance, it requires the beneficiary of the bond—in this circumstance, the party being enjoined—to specify in writing the precise manner in which the bond is allegedly insufficient. (§§ 995.930, subd. (a), 995.920.) By requiring that it be made by noticed motion

(§ 995.930, subd. (a)), the statute ensures that the nature of the objection will be further explained in a memorandum of points and authorities. The requirement of notice also guarantees the opponent an opportunity to respond. By requiring the objecting party to estimate the amount of a bond which would be sufficient (*ibid.*), the statute presents the trial court with concrete alternatives from which to choose. Finally, the short time limit in which to object (*id.*, subd. (b)) ensures that the trial court's supposed error will be raised promptly.

In determining whether the defendants' incomplete compliance with section 995.930 is sufficient to prevent an unintentional waiver, we measure their performance against these statutory purposes. Their written objection alerted both the court and counsel to the specific issue (i.e., that the proposed order "fail[ed] to make provision for a bond" that would protect the defendants "against the possibility that [the plaintiff would] not prevail at trial" ). It set out an estimate of what an adequate bond would be ($315,000 per year), identified the evidence on which that estimation was based, and explained how that figure was calculated from that evidence. Prior to any final ruling being made, the plaintiff was able to respond in writing (without, we might add, contending that the objection was untimely, objecting that the procedure was improper, or claiming that it had been prejudiced by the lack of additional notice). Finally, the objection was not only made promptly upon the trial court's initial ruling, but before that ruling was put into effect by the entry of a formal order.

In short, although the objection was not in the prescribed form, it nevertheless complied with the substance of each of the statutory requirements, and thereby met the objectives of section 995.930. While the abbreviated procedure adopted by the defendants was not and is not statutorily authorized, it is doubtful whether strict compliance with the procedural requirements of the statute would have materially added to the substance, as opposed to the length, of the objection. Instead, the trial court would have been presented with the same facts, the same argument, and the same issue.[5]

Under these facts, we find that the defendants' ex parte objection substantially complied with the statutory procedure for contesting the sufficiency of the bond. Since neither the trial court nor the plaintiff insisted upon strict compliance with section 995.930, that substantial compliance is sufficient to prevent the waiver provided by subdivision (c) of that section. Therefore, the

---

[5]Although the final order required a $1,000 bond where the tentative ruling had required no bond at all, we do not view the factual circumstances, or the issue, as having been substantially changed by that addition. Under the facts of this case, a $1,000 bond is the equivalent of no bond at all.

defendants did not waive their right to have this court review the adequacy of the amount of that bond on appeal.

### 2. *Is the Undertaking Insufficient?*

■ Section 529, subdivision (a), requires that the amount of the undertaking be sufficient to "pay to the party enjoined such damages . . . as the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." Thus, the trial court's function is to estimate the harmful effect which the injunction is likely to have on the restrained party, and to set the undertaking at that sum. (*Hummell* v. *Republic Fed. Savings & Loan Assn.* (1982) 133 Cal.App.3d 49, 51 [183 Cal.Rptr. 708]; *Greenly* v. *Cooper* (1978) 77 Cal.App.3d 382, 390 [143 Cal.Rptr. 514].) That estimation is an exercise of the trial court's sound discretion, and will not be disturbed on appeal unless it clearly appears that the trial court abused its discretion by arriving at an estimate that is arbitrary or capricious, or is beyond the bounds of reason. (*Greenly, supra,* at p. 390.)

In reviewing the trial court's estimation, the first step is to identify the types of damages which the law allows a restrained party to recover in the event that the issuance of the injunction is determined to have been unjustified. The sole limit imposed by the statute is that the harm must have been proximately caused by the wrongfully issued injunction. (§ 529, subd. (a).) Case law adds only the limitation that the damages be reasonably foreseeable. (*Rice* v. *Cook* (1891) 92 Cal. 144, 148 [28 P. 219] [not " 'remote' "]; *Handy* v. *Samaha* (1931) 117 Cal.App. 286, 290 [3 P.2d 602] [" 'reasonably anticipated' "].)

■ When an injunction restrains the operation of a business, foreseeable damages include "the profits which [the operator] would have made had he not been prevented by the injunction from carrying on his business." (*Lambert* v. *Haskell* (1889) 80 Cal. 611, 618 [22 P. 327].) ■ Thus, the defendants correctly sought to have the undertaking include the losses which they will incur by reason of the prohibition against their continued solicitation of business from former customers of the plaintiff. In their objection, the defendants argued that, by the plaintiff's own analysis of the evidence, those customers accounted for 87.7 percent of Seaquist's invoices, representing $26,000 in sales per month, or $315,000 per year. The plaintiff did not dispute their interpretation of the evidence, either below or on appeal. Therefore, while those lost sales will undoubtedly be offset to some degree by savings resulting from reduced sales expenses or costs of goods sold, it is undisputed that the injunction will cause the defendants to incur very substantial lost profits.

At the final hearing on the application for the injunction, the trial court appeared to believe that it would be a simple matter for the defendants to locate new customers for their products, and that the proposed injunction, restraining them from soliciting further orders from the plaintiff's customers, would be only a "minor inconvenience . . . ."[6] This may have been the trial court's rationale for setting the undertaking at the nominal sum of $1,000.[7] Certainly, it is the ground upon which the plaintiff seeks to justify that action.

That reasoning, however, ignores the fact that section 529 requires that the potential damages be estimated on the assumption that the preliminary injunction was wrongfully issued, i.e., that the plaintiff did not have the right to keep the defendants from soliciting its customers. Under that hypothetical circumstance, the defendants would be entitled to solicit business from both the plaintiff's former customers and entirely new customers, and thus would be entitled to retain all profits from sales to both subsets of potential buyers. Therefore, the losses which they are likely to suffer from being precluded from soliciting business from their existing customer base cannot be offset by any profits they may make from sales to new customers. A nominal undertaking cannot be justified on the ground that the defendants' profitability could remain constant, when their sales and profitability might have risen in the absence of the injunction.

Furthermore, the plaintiff's analysis ignores another type of damage which the undertaking must take into account: attorney's fees. ■ "It is now well settled that reasonable counsel fees and expenses incurred in successfully procuring a final decision dissolving the injunction are recoverable as 'damages' within the meaning of the language of the undertaking, to the extent that those fees are for services that relate to such dissolution [citations]." (*Russell* v. *United Pacific Ins. Co.* (1963) 214 Cal.App.2d 78, 88-89 [29 Cal.Rptr. 346]; and see generally 6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, §§ 334-335, pp. 283-284, and Conners, Cal. Surety and Fidelity Bond Practice (Cont.Ed.Bar 1969) Injunction, §§ 22.18-22.21,

---

[6]"THE COURT: You're telling me that these customers are easy to find, they're in all these directories, there's no problems. Well, what's the big deal about having [the defendants] go out and solicit people who are not Abba customers and eliminating the people from contacting the Abba customers?

"THE COURT: . . . [W]hat would be the inconvenience? What would it be other than a minor inconvenience since these [other potential buyers] are available for you to go out and do that?"

[7]In the abstract, $1,000 is not an insignificant sum. It may be an appropriate undertaking in cases of harassment or trespass. However, in the context of an undertaking designed to secure a business's right to recover damages resulting from the improvident issuance of legal process, it is negligible. For instance, the statutory *minimum* for an undertaking filed in connection with a superior court's writ of attachment is $7,500. (§ 489.220.)

pp. 321-323.) Thus, "a successful appeal from an order granting an injunction, after notice and hearing, gives rise to liability on the bond for damages" in the amount of the attorney's fees incurred in prosecuting that appeal. (*Russell* v. *United Pacific Ins. Co., supra,* at p. 85.) If the preliminary injunction is valid and regular on its face, requiring the defendant to defend against the main action in order to demonstrate that the injunction was wrongfully issued, the prevailing defendant may recover that portion of his attorney's fees attributable to defending against those causes of action on which the issuance of the preliminary injunction had been based. (*Id.,* at pp. 85-86, 88-89.)

 Thus, in calculating the amount of the undertaking to be required in this case, the trial court should have considered at least (1) the profits to be lost by the defendants from the elimination of the vast majority of their existing customers, and (2) the attorney's fees and expenses to be incurred in either prosecuting an appeal of the preliminary injunction, or defending at trial against those causes of action upon which the preliminary injunctive relief had been granted. ██ ██ By setting that undertaking at $1,000, the trial court impliedly estimated that those two classes of damages would total no more than that sum.[8]

 That estimation is not within the bounds of reason. Even ignoring the lost profits, there is no reasonable possibility that the attorney's fees and expenses necessary to dissolve the injunction, either through appeal or trial, would not exceed $1,000. It is well known that litigation is extraordinarily expensive. That is especially true in commercial litigation such as this, in which two businesses are fighting over the right to sell to a particular customer base amid allegations of misappropriation of trade secrets and unfair competition. Such a battle is likely to be vigorously fought, as shown by the number and length of the submissions by both sides concerning the application for preliminary injunction below. Expenses alone would be likely to substantially exhaust the liability limit created by the trial court. Indeed, in the current appeal, filing fees and the costs of the preparation of the

---

[8]Since a trial court must deny an application for a preliminary injunction "unless there is a reasonable probability that plaintiff will be successful in the assertion of his rights" (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889]), the trial court below, by granting the application, impliedly found that the defendants were not likely to prevail at trial. From this finding, it may have reasoned that only a nominal undertaking was necessary because it was not probable that the defendants would ever be entitled to collect any damages for the harm caused by the preliminary injunction.

If so, that reasoning is fallacious. The undertaking is designed to compensate the defendants in the event, however unlikely, that the preliminary injunction is finally determined to have been unjustified. The probability that they will actually obtain such a favorable determination, either through appeal or trial, is irrelevant in determining the likely amount of those damages.

clerk's and reporters' transcripts have certainly consumed over half of that sum. When attorney's fees and lost profits are added into the equation, the utter inadequacy of the undertaking is clear.

## B. WAS THE ISSUANCE OF AN INJUNCTION AN ABUSE OF DISCRETION?

The plaintiff contends that the injunction was necessary to restrain the misappropriation of trade secrets, as authorized by the Uniform Trade Secrets Act (Civ. Code, §§ 3426-3426.10), and the statutory remedies for unfair competition (Bus. & Prof. Code, §§ 17200-17208). We conclude that the preliminary injunction was justified by the plaintiff's showing regarding misappropriations of trade secrets, and thus do not decide whether it could also have been justified on the ground of unfair competition.

### 1. Standard of Review

A court may enjoin actual or threatened misappropriations of trade secrets. (Civ. Code, § 3426.2, subd. (a).) "[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial." (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) That is because a request for an injunction must be denied "unless there is a reasonable probability that plaintiff will be successful in the assertion of his rights." (*Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 528.) "The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp., supra,* at pp. 69-70.) The trial court balances these two factors to determine either " ' "that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him." ' " (*Id.,* p. 70, quoting from *Continental Baking Co., supra,* at p. 528.)

 That determination " 'rests in the sound discretion of the trial court, and . . . may not be interfered with on appeal, except for an abuse of discretion.' " (*IT Corp., supra,* 35 Cal.3d at p. 69, quoting from *People* v. *Black's Food Store* (1940) 16 Cal.2d 59, 61 [105 P.2d 361].) "A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' [Citations.] Further, the burden rests with the party challenging the injunction to make a clear showing of an abuse of discretion." (*IT Corp., supra,* at p. 69.)

Therefore, our inquiry is defined as follows: Have the defendants clearly shown that the trial court either exceeded the bounds of reason or

contravened uncontradicted evidence when it concluded that they should be restrained from exercising their alleged right to solicit the plaintiff's customers?

### 2. *Definition of Trade Secret*

While the defendants also contest the form and scope of the injunction, their sole challenge to the substance of the injunction is that the trial court abused its discretion because there was no evidence, contradicted or otherwise, to establish that the plaintiff's customer list satisfied all of the elements of the definition of a trade secret.

 " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

"(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

"(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).) Thus, the definition consists of three elements: (a) information (b) which is valuable because unknown to others and (c) which the owner has attempted to keep secret. (See Comment, *The Secret's Out: California's Adoption of the Uniform Trade Secrets Act—Effects on the Employer-Employee Relationship* (1987) 20 Loyola L.A. L.Rev. 1167, 1218-1219 [hereafter Comment].)

A customer list is one of the types of information which can qualify as a trade secret. (*American Paper & Packaging Products, Inc.* v. *Kirgan* (1986) 183 Cal.App.3d 1318, 1323-1324 [228 Cal.Rptr. 713].) The defendants do not claim otherwise. Similarly, they admit that substantial, albeit conflicting, evidence supports the trial court's conclusion that the plaintiff took reasonable steps to maintain the secrecy of the information. Thus, the first and third elements are satisfied.

### a. *Was the Information Generally Known?*

 The defendants focus on the second element: that the information has value which is derived from the fact that it is not generally known to other persons (i.e., the plaintiff's competitors) who can obtain economic value from the use of that information. The trial court expressly found this element to exist, but the defendants argue that its conclusion is not supported by the record. Specifically, they contend that while the plaintiff did present

evidence that its customer list was valuable, it did not demonstrate that its value was derived from its secrecy.

The defendants are correct in pointing out that a showing of value, by itself, is not sufficient to satisfy the statutory definition. A list of those persons who have demonstrated a willingness to order and pay for the goods or services of a particular business will always have value to that business. However, the statute also requires that the information have value to other businesses which are unaware of the information and which could put that information, if known, to beneficial use.

By itself, knowledge of the identities of the businesses which buy from a particular provider of goods or services is of no particular value to that provider's competitors. However, that information is valuable to those competitors if it indicates to them a fact which they previously did not know: that those businesses use the goods or services which the competitors sell.

By way of illustration, consider a hypothetical market for widgets, supplied by five widget sellers. There are 100,000 businesses engaged in industries which have been known to use widgets in their operations; however, there is no way for the widget sellers to know for sure which of those individual businesses use widgets and which do not. Seller A has a list of 500 businesses to which he has sold widgets in the recent past. That list proves a fact which is unknown to his competitors: that those 500 businesses are consumers of widgets, the product they are trying to sell. Therefore, it has independent value to those competitors, because it would allow them to distinguish those proven consumers, who are definitely part of the widget market, from the balance of the 100,000 potential consumers, who may or may not be part of the market. With that list, they would know to target their sales efforts on those 500 businesses, rather than on 500 other businesses who might never use widgets.

Now imagine the same facts, but assume that each of the other four sellers of widgets knows that the businesses on Seller A's customer list are proven widget consumers (although they do not know that those businesses buy their widgets from Seller A). Under those circumstances, Seller A's customer list has no independent economic value, because the identities of those consumers are already known to his competitors.

In both situations, the identities of the businesses which bought widgets from Seller A are unknown. The distinguishing factor is whether it is also unknown that those businesses bought widgets at all. Thus, the customer list in the first hypothetical would be a protectable trade secret, while the list in the second hypothetical would not be.

For instance, the facts in *American Credit Indemnity Co.* v. *Sacks* (1989) 213 Cal.App.3d 622 [262 Cal.Rptr. 92] fit within the first hypothetical. There, only 6.5 percent of the businesses which could use the product—credit insurance—actually did so. (*Id.*, p. 625.) There was no way to distinguish those that did from the 93.5 percent that did not; thus, a seller of that product could not " 'see at a glance where to attempt to sell his wares.' " (*Id.* at p. 633, quoting from *Avocado Sales Co.* v. *Wyse* (1932) 122 Cal.App. 627, 634 [10 P.2d 485].) Because knowledge of the customer list would allow "a competitor to direct sales efforts to the elite 6.5 percent of those potential customers which already have evinced a predisposition to purchase credit insurance," that list was held to have economic value from not being known to those competitors, and otherwise to meet the definition of a trade secret. (*American Credit Indemnity Co.*, supra, at pp. 630-631.)

*Courtesy Temporary Service, Inc.* v. *Camacho* (1990) 222 Cal.App.3d 1278 [272 Cal.Rptr. 352] would also fall within the first hypothetical. There, the "product" being sold was temporary employees. While all employers were potential consumers of such a product, there was no way to determine which employers actually sought or hired temporary employees. Therefore, the plaintiff's customer list had economic value to competitors of the plaintiff, because it listed a fact unknown to them: the identity of employers "who have demonstrated their willingness to use temporary employees. . . ." (*Id.*, p. 1282.)

In applying this distinction to the facts before us, the critical factual issue is whether it is generally known that the businesses on the plaintiff's customer list are consumers of rubber rollers. If that fact is known to competing suppliers of rubber rollers, then the fact that those businesses are customers of the plaintiff is not a trade secret. However, if it is not known that those businesses use rubber rollers, then their identity as plaintiff's customers is a trade secret.

Here, substantial evidence indicates that this information was not known. For instance, the plaintiff's president testified "that one of the most difficult parts of [the plaintiff's] job is to determine which companies, of all the businesses in the United States, need rubber rollers . . . . Customers are not readily recognizable or identifiable, and the process which brings to light the names of potential customers is . . . expensive and time consuming." "[T]he customer lists represent a winnowing down from a generalized list of companies which may utilize rubber rollers or rubber molded products to a valuable and discrete listing of a more limited number of existing and potential customers. [Those lists] are an enormously valuable resource to [the plaintiff], as well as to any competitor. Indeed, any competitor . . . could not duplicate [those lists] without similar years of effort and expense."

Those lists are confidential, to keep their contents from the plaintiff's competitors. The trial court could have inferred from that evidence that it was not generally known that those businesses used rubber rollers.

### b. *Was the Information Readily Ascertainable?*

■ The defendants argue that the identity of the consumers of rubber rollers nevertheless fails to meet the definition of a trade secret because those identities are "readily ascertainable," and thus not secret. Specifically, they claim that the identity of those consumers is revealed in trade directories, telephone books, and other sources which list the names of "several types of businesses which commonly use rubber rollers . . . ."

This contention must fail, because whether a fact is "readily ascertainable" is not part of the definition of a trade secret in California. Section 1, subdivision (4)(i), of the Uniform Trade Secrets Act, as proposed by the National Conference of Commissioners on Uniform State Laws, refers to information which "derives independent economic value, actual or potential, from not being generally known to, *and not being readily ascertainable by proper means by*, other persons who can obtain economic value from its disclosure or use . . . ." (14 West's U. Laws Ann. (1990) U. Trade Secrets Act, § 1, p. 438, italics added.) However, when the Legislature adopted that provision as Civil Code section 3426.1, subdivision (d)(1), it deleted the highlighted phrase. That deletion apparently resulted from arguments that conditioning the scope of a trade secret on the extent to which the information was not readily ascertainable would " 'mudd[y] the meaning of the term trade secret' " and " 'invite[] the various parties to speculate on the time needed to discover a secret.' " (Comment, *supra*, 20 Loyola L.A. L.Rev. at p. 1214, fn. 231, quoting from Senate Com. on Judiciary, Selected Bill Analyses (1984) Assem. Bill No. 501, pp. 5-6.)

In short, our Legislature chose to exclude from the definition only that information which the industry already knows, as opposed to that which the industry could easily discover. Therefore, under California law, information can be a trade secret even though it is readily ascertainable, so long as it has not yet been ascertained by others in the industry. Accordingly, we decline to follow *American Paper & Packaging Products, Inc.* v. *Kirgan, supra*, to the extent that it suggests that information is not protectable as a trade secret if it is "known *or readily ascertainable*" (183 Cal.App.3d at p. 1326; italics added).[9]

---

[9]While ease of ascertainability is irrelevant to the definition of a trade secret, "the assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation." (Legis. committee com., West's Ann. Civ. Code, § 3426.1 (1991 pocket supp.) p. 111.) Therefore, if the defendants can convince the finder of fact at trial (1)

C, D*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

An injunction cannot remain in effect without an adequate undertaking. Therefore, the preliminary injunction is reversed. No further preliminary injunction shall be issued unless its issuance is conditioned upon the furnishing of an adequate undertaking. We do not purport to determine what an adequate amount would be. Rather, we leave that determination to the trial court, taking into consideration the types of damages discussed in this opinion. If further evidence or argument would assist the trial court in that determination, it may wish to conduct a hearing in the manner of Code of Civil Procedure section 995.950.

Any preliminary or permanent injunction issued in this case in the future shall both clearly and narrowly define the scope of the proscribed activities, in accordance with the views expressed in this opinion.

Appellants shall recover their costs on appeal.

Ramirez, P. J., and Timlin, J., concurred.

---

that "it is a virtual certainty that anyone who manufactures" certain types of products uses rubber rollers, (2) that the manufacturers of those products are easily identifiable, and (3) that the defendants' knowledge of the plaintiff's customers resulted from that identification process and not from the plaintiff's records, then the defendants may establish a defense to the misappropriation claim. That defense, however, will be based upon an absence of misappropriation, rather than the absence of a trade secret.

*See footnote, *ante*, page 1.