Filed 9/22/25  Starjet v. SEJ Air CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| STARJET, INC. et al., | B344914 |
| Plaintiffs, Cross-defendants, and Appellants, | (Los Angeles County Super. Ct. No. 24LBCV02556) |
| v. |  |
| SEJ AIR, LLC, et al., |  |
| Defendants, Cross-complainants, and Respondents. |  |

———————————

APPEAL from orders of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Reversed.

Jeremy Schuster for Plaintiffs, Cross-defendants, and Appellants.

Jonathan S. Morse for Defendants, Cross-complainants, and Respondents.

———————————

Plaintiff, cross-defendant and appellant Starjet, Inc. (Starjet) challenges the trial court's order granting a preliminary injunction requiring it to return maintenance records for a jet aircraft to the plane's owner, defendant, cross-complainant and respondent SEJ Air, LLC (SEJ). Starjet had leased the aircraft from SEJ, and together with plaintiff Sundance Air Support (Sundance),[1] had upgraded the plane at SEJ's direction. Starjet withheld the records after SEJ terminated the lease and failed to pay for the upgrades. The aircraft was effectively grounded because SEJ was unable to establish the plane's airworthiness without access to the records.

We reverse because the trial court did not require SEJ to furnish an undertaking as a condition for the injunction, as is required by Code of Civil Procedure section 529, subdivision (a).[2] In addition, we agree with Starjet that the injunction was unduly broad and vague in requiring Starjet to turn over documents that merely "refer to" the maintenance of the aircraft. We disagree with Starjet, however, that the decision to grant any injunction at all was an abuse of discretion.

---

[1] Sundance has joined in Starjet's appeal, but it was not a subject of the preliminary injunction. Accordingly, it is not a "party aggrieved" by the ruling and lacks standing to appeal that order. (Code Civ. Proc., § 902; accord, *Turrieta v. Lyft, Inc.* (2021) 69 Cal.App.5th 955, 970-971.) We therefore dismiss Sundance's appeal. (See *Life v. County of Los Angeles* (1990) 218 Cal.App.3d 1287, 1292.)

[2] Subsequent unspecified statutory references are to the Code of Civil Procedure.

## FACTS AND PRIOR PROCEEDINGS

In 2019, Starjet leased a Gulfstream G-IV jet aircraft from SEJ for one year.[3]  Starjet is a licensed air carrier, and according to a declaration from SEJ's aircraft repair and maintenance expert, "[i]t is typical in the aviation industry for a corporate jet aircraft such as a Gulfstream G-IV to be leased by the owner to" a licensed air carrier "so the aircraft can be used for charter to defray some of the expenses of owning and operating the aircraft. In such instances, the . . . [a]ir [c]arrier . . . is responsible for maintaining operational control of the aircraft's maintenance and is required to maintain the aircraft's maintenance records in accordance with" federal regulations.  The air carrier must also "provide adequate storage and protection to prevent damage or destruction of these records, and properly maintain the aircraft's maintenance records by documenting the work performed."

The lease between Starjet and SEJ reflected these expectations.  It called for Starjet to pay SEJ $2,500 per flight hour for use of the plane.  Starjet was responsible for maintaining the aircraft, but SEJ was required to reimburse

---

[3] Despite the requirement that the appellate record include all matters material to deciding the issues raised (Cal. Rules of Court, rule 8.163), the record here omits numerous pertinent documents and further fails to include any reporter's transcript or settled statement from the preliminary injunction hearing.  To provide necessary background and context, we sua sponte augment the record to include Starjet's and Sundance's complaint and amended complaint; SEJ's cross-complaint, amended cross-complaint, and motion for a preliminary injunction; and the trial court's signed order granting the injunction.  (*Id.*, rule 8.155(a)(1)(A).)

Starjet for those maintenance and repair expenses. SEJ was also obligated to pay Starjet a $4,000 monthly management fee, to be set off against Starjet's payments to SEJ for charter revenues. As part of its maintenance obligation, Starjet was required to "[m]aintain [a]ircraft logbooks, maintenance- [*sic*], and other records" and to "make such logs and records available to [SEJ] or its designee for inspection and copying." The lease term ended September 30, 2020, with no provision for extending it. Both parties had the right to terminate the lease with a 30-day written notice.

Starjet remained in possession of the plane after September 30, 2020, and both sides agree that they extended the lease, so that it remained in effect through July 2024. In 2023, the parties agreed that Starjet and Sundance would upgrade and refurbish the plane at SEJ's expense. Sundance's CEO, Nader Sarkhosh, declared that Sundance "provided landing gear, engine thrust reversers, and parts" for the aircraft as part of the upgrades.

At some point after the agreement to upgrade the plane, the relationship among the parties broke down. According to Starjet, SEJ became upset with delays in the upgrades and refused to pay for them. SEJ, for its part, "admits that it has not yet paid all of the invoices received from" Starjet, but claims it must audit the invoices to determine whether they are "appropriate." In June 2024, the upgrades were complete, and the plane returned to service.

4

Starjet alleges that around this time, defendant Jonathan Shokrian, the son of SEJ's owner, defendant Elias Shokrian,[4] began attempting to interfere with charter operations of the plane. According to Starjet, Jonathan demanded that charter brokers pay SEJ directly for use of the plane and claimed to have informed a government agency that "the plane is stolen," and that "[a]ny pilot flying the plane will be arrested." SEJ acknowledged telling a third party that "Starjet[] has no authorization to fly" the plane, and that "[w]e are contacting the police later today."

In the summer or early autumn of 2024, SEJ took back possession of the aircraft. Neither party explains exactly how this happened or where the plane was moved, except that it remained at Los Angeles International Airport (LAX). Starjet's CEO, Pekka Karu, claims the plane "was hijacked," in that it "was unlawfully seized from Starjet's control and taken to an unknown destination."

Although SEJ recovered the plane, it did not have access to the maintenance records. SEJ's repair and maintenance expert explained that, "[w]ithout access to the maintenance records for the [a]ircraft, there is no way I could verify that the [a]ircraft is airworthy." As a result, SEJ was unable to operate the plane, even to relocate it from LAX to the Van Nuys Airport. SEJ claims it demanded that Starjet return the records, but Starjet "has failed and refused to" do so.

In a letter to SEJ's attorney, Starjet's attorney wrote, "I do not know what your client's agents removed when they

---

[4] We refer to the Shokrians by their first names in order to distinguish between them. We intend no disrespect.

5

wrongfully took the [a]ircraft months ago, but I would suggest you speak with them regarding the logbooks . . . . My clients are not compelled to assist yours in any way until such time as the amounts due are fully paid and the matter of termination . . . are addressed." In a later letter, the attorney clarified that "my clients previously searched for and did not locate the records and logbooks regarding the . . . aircraft."

Karu declared that as of the plane's last flight under Starjet's control in July 2024, "[t]he [a]ircraft was airworthy and the necessary records to determine airworthiness were in the [aircraft] at that time." Karu also denied that the lack of records precluded moving the plane: "at a worst case scenario, SEJ could redo the last inspection to ensure airworthiness, receive the appropriate endorsement, and fly" the plane. Sundance's CEO, Sarkhosh, acknowledged that the difference of opinion regarding the difficulty of determining airworthiness stemmed in part from the parties' experience operating the plane. Although SEJ's expert might need access to all maintenance records before obtaining a special flight permit for the plane, Sarkhosh would not. "The significant difference is that I am familiar with the history of [the aircraft] and the work which was performed. I am not required, however, to assist SEJ because it did not pay for the services, work, parts, labor, etc. relating to" the plane.

Karu also suggested that some of the relevant records might be available digitally: "Starjet paid for [a] subscription to the CAMP system, which is an optional method for centralization of recordkeeping, used for [the aircraft]; the owner of an aircraft can designate the person(s) to serve as the liaison for input of those records. Starjet has not been paid for its invoices to SEJ and Starjet is not required to do anything with regard to CAMP

6

at this point; the CAMP service is subscription based and, if it has not already expired, I expect it expires this month—but SEJ has not paid Starjet, and no longer has anything to do with that aircraft, so Starjet will not be renewing its subscription. None of this prevents action by any aircraft owner from maintaining its own subscription to CAMP or access to its records."

In November 2024, Starjet and Sundance filed a complaint alleging 11 causes of action against SEJ and the Shokrians. The plaintiffs claimed the defendants owed Starjet $675,477.02, and Sundance $706,886.25 for aircraft maintenance, improvements, and other costs. Starjet also alleged defamation by Jonathan for claiming to have informed government officials that "the plane is stolen," and that "[a]ny pilot flying the plane will be arrested," among other disparaging statements. The plaintiffs also sought declaratory relief stating that they were entitled to mechanics liens on the plane for the amounts owed them. Two days after filing the complaint, Starjet and Sundance filed claims of mechanics liens on the plane.

In December 2024, SEJ filed a cross-complaint against Starjet alleging one cause of action for conversion and one for injunctive relief. Both causes of action were based on Starjet's alleged failure to return the maintenance records.

The attorney for Starjet and Sundance reviewed the cross-complaint and "determined the second cause of action," for injunctive relief, "did not constitute a cause of action." Rather than file a demurrer, the attorney contacted SEJ's attorney, who agreed to amend the cross-complaint. SEJ indeed filed an amended cross-complaint removing the cause of action for an injunction. The new cross-complaint included 12 causes of action,

7

including new causes of action for declaratory relief challenging the validity of the mechanics liens.

SEJ filed a separate motion for a preliminary injunction seeking the return of "all of the maintenance records for" the aircraft from Starjet, as well as an order requiring Starjet "to communicate to all necessary persons and entities . . . authorization for SEJ . . . to communicate directly with such persons and entities to obtain information and documentation" relevant to the plane's maintenance and airworthiness. In the motion, SEJ argued that Starjet no longer had any right to the maintenance records, and that its continued possession of the records caused a great deal of waste by preventing the aircraft from returning to service.

Starjet opposed the motion, arguing that SEJ had unclean hands because it had not paid the invoices from Starjet or Sundance. In addition, Starjet contended SEJ could not show either irreparable injury or a likelihood of prevailing on the merits, and had failed to post a bond as required by section 529. Finally, Starjet argued a preliminary injunction would be inappropriate because it would upset rather than preserve the status quo.

In its reply, SEJ argued that Starjet's denials as to its possession of the maintenance records were not absolute. Although Karu and Sarkhosh had declared that the *most recent* records were aboard the aircraft in July 2024, they did not claim that *all* maintenance records were on board the plane. SEJ's maintenance and repair expert had declared that federal regulations require air carriers to maintain the maintenance records of the planes they operate, which in the case of a Gulfstream aircraft like the one at issue here are voluminous and

8

might "fill several bankers boxes." SEJ thus argued that the records at issue were not on the plane, and that Starjet knew where they were. SEJ also argued that the equities favored granting the injunction because the plane was of no value grounded, and SEJ was paying $1,200 per day to store it at LAX. SEJ stated it was willing to post a bond of up to $694,263.28 to protect Starjet's interests.

The trial court granted the injunction in part, finding that SEJ had demonstrated it was likely to prevail on the merits of its conversion claim, on the basis of SEJ's allegation that "Starjet wrongfully withheld its personal property, the maintenance records, which caused SEJ damages." In addition, the court found SEJ was suffering interim harm because of the $1,200 per day storage fees, which could not be avoided without access to the records. Thus, the court ordered Starjet "to return to . . . SEJ . . . all of the maintenance records for the aircraft, including but limited [*sic*] to the maintenance logbooks for the airframe, its engines, and all documents which record, memorialize or refer to any maintenance, alterations, inspections and/or repairs to the [a]ircraft." The court denied the request for an order requiring Starjet to communicate to all relevant parties authorization for SEJ to obtain maintenance information and documentation because the request was "overly broad and too vague." The court's order was silent with regard to any requirement that SEJ post a bond as a condition for the injunction.

## DISCUSSION

### A. The Trial Court Erred by Failing to Require an Undertaking from SEJ

Under section 529, "[o]n granting a[ preliminary] injunction, the court or judge *must* require an undertaking on the

9

part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (*Id.*, subd. (a), italics added.) Starjet requested that SEJ be required to post a bond as a condition of the preliminary injunction, and SEJ offered to post a bond of $694,263.28, equal to the amount of the lien Starjet filed against SEJ's aircraft, but the trial court issued the injunction without requiring a bond.

Starjet contends this was error, and we agree. The imposition of a bond or undertaking as a condition of a preliminary injunction "is mandatory, not discretionary" (*ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 10), and "a preliminary injunction does not become operative until a bond is furnished" (*Griffin v. Lima* (1954) 124 Cal.App.2d 697, 699). An order imposing a preliminary injunction without a bond "must be reversed." (*Miller v. Santa Margarita Land etc. Co.* (1963) 217 Cal.App.2d 764, 766, fn. omitted.)

In its respondent's brief, SEJ asserts, without any explanation or elaboration, that "[t]he [o]rder for [i]njunction issued by the [t]rial [c]ourt which is the subject of this [a]ppeal has been rendered moot and SEJ has no reason to defend this appeal." If that is the case, then the reversal of the preliminary injunction will make no difference. If SEJ does seek to reinstate the preliminary injunction and should the trial court agree, the court must also require SEJ to post a bond as set forth in section 529. Should the court reinstate the preliminary injunction, we leave to the trial court's discretion the determination of the proper amount of the undertaking. (*ABBA Rubber Co. v. Seaquist, supra*, 235 Cal.App.3d at p. 14.)

**B.    The Injunction Was Overbroad and Vague in Requiring Starjet to Turn Over Documents That Merely Refer to the Aircraft's Maintenance**

We agree with Starjet on one additional point: the injunction was overly broad and vague because it required Starjet to turn over "all documents which record, memorialize *or refer to* any maintenance, alterations, inspections and/or repairs to the [a]ircraft or any component thereof" (italics added). Starjet notes that the category of documents that "refer to any maintenance, alterations, inspections and/or repairs" is broad and might include proprietary corporate records and many other documents not necessary for determining the airworthiness and continued maintenance of the aircraft. So long as SEJ has access to the documents that record or memorialize the maintenance of the aircraft, we see no reason why the injunction also required providing internal Starjet-only documents that merely refer to maintenance or repair. In so holding, however, we in no way intimate that this category of documents is not subject to discovery in the underlying lawsuit.

**C.    The Trial Court Did Not Abuse Its Discretion in Granting the Injunction**

Despite the two errors we noted above, we reject the remainder of Starjet's arguments against the injunction. "The decision whether to issue a preliminary injunction lies in the sound discretion of the trial court, which we do not disturb" unless "the party challenging the injunction . . . make[s] a clear showing the trial court abused its discretion." (*People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 283.) "In general, when considering a request for a preliminary injunction, the trial court weighs two interrelated factors. The first is the likelihood

the party seeking relief will prevail on the merits, and the second is the relative interim harm to the parties if the preliminary injunction is granted or denied. [Citations.] The goal is to minimize the harm that an erroneous interim decision would cause." (*Ibid.*)

The trial court's ruling reflects a reasonable balance of these factors. So long as the maintenance records remained in Starjet's possession, the Gulfstream was effectively grounded, where it could serve no purpose to anyone.[5] After SEJ took the plane back, Starjet had no use for the records except as leverage against SEJ. The trial court might have reasonably determined that the liens filed against the plane protected Starjet's interests, and that by issuing the preliminary injunction, the court could allow the plane to return to use without compromising Starjet's ability to recover what it was owed. Issuing the injunction thus minimized the potential harm.

Starjet also contends the trial court erred by issuing the injunction because a "preliminary injunction is intended to 'preserv[e] . . . the status quo until a final determination of the merits of the action.'" (*People v. Uber Technologies, Inc.*, *supra*, 56 Cal.App.5th at p. 283.) But Starjet acknowledges that a "preliminary injunction [that] mandates an affirmative act [and] changes the status quo" may be appropriate " ' " ' "in extreme cases where the right [to the injunction] is clearly established." ' ' " ' " (*City of Corona v. AMG Outdoor Advertising, Inc.* (2016) 244 Cal.App.4th 291, 299.) As we noted above, Starjet

---

[5] Because SEJ lost use of the plane, we disagree with Starjet's contention that the only injury SEJ suffered was monetary.

12

does not claim any right to the maintenance records except as a form of security to guarantee payment for its services. In light of the court's implied finding that this security was not needed, the court did not abuse its discretion by upsetting the status quo in this case.

Finally, Starjet contends the trial court abused its discretion by issuing a blanket order overruling its evidentiary objections and its request for judicial notice. But Starjet offers no argument that the trial court erred on the merits of its decision; Starjet's objection is only to the manner of the court's ruling. "[I]t is a fundamental principle of appellate procedure that a trial court [order] is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) Starjet has not overcome this burden. We infer from the court's ruling that it found no merit in Starjet's objections or in its request for judicial notice, and Starjet provides no reasoned argument as to any individual objection or request for judicial notice.

13

## DISPOSITION

The trial court's order imposing the preliminary injunction is reversed.  Each party is to bear its own costs on appeal.

NOT TO BE PUBLISHED.


WEINGART, J.


We concur:


ROTHSCHILD, P. J.


M. KIM, J.