Filed 8/1/24  Mesquite Country Club etc. v. Save Oswit Canyon CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MESQUITE COUNTRY CLUB CONDOMINIUM HOMEOWNERS ASSOCIATION, | D082746 |
| Plaintiff and Appellant, | (Super. Ct. No. CVPS2203251) |
| v. | |
| SAVE OSWIT CANYON, INC., etc., | |
| Defendant and Respondent; | |
| PETER L. TRIPODES et al., | |
| Interveners and Respondents. | |

APPEAL from orders of the Superior Court of Riverside County, Carol A. Greene, Judge.  Motion to dismiss appeal denied.  Order denying anti-SLAPP motion reversed; order dissolving preliminary injunction affirmed.

Capobianco Law Offices, Anthony Capobianco, Derek Wallen; Slovak Baron Empey Murphy & Pinkney, Shaun Murphy; Murphy, Pearson, Bradley & Feeney, Jeff C. Hsu and Marin Gillespie for Plaintiff and Appellant.

Burke Williams & Sorenson, Mark J. Mulkerin, Richard J. Reynolds and John R. Horstmann for Defendant and Respondent.

Law Offices of Peter L. Tripodes and Peter L. Tripodes for Interveners and Respondents.

This appeal arises out of litigation concerning a deteriorated golf course at the center of an integrated residential community in Palm Springs.

Plaintiff and appellant, the Mesquite Country Club Condominium Homeowners Association (the HOA), manages the community. The HOA has sued the owners of the golf course and its facilities, including defendant and respondent Save Oswit Canyon, Inc., doing business as the Oswit Land Trust, a nonprofit corporation (Oswit). Interveners and respondents Peter L. Tripodes and Nicoletta M. Tripodes own a condominium in the community.

Essentially, the HOA contends that Oswit must restore the property to a usable golf course, whereas Oswit seeks to transform the property into a nature preserve. The Tripodeses intervened in this dispute, alleging that the HOA board members voted to initiate this lawsuit without proper notice and input from the Mesquite homeowners. The Tripodeses generally agree with Oswit that it can and should proceed with its plans for the property.

Here, the HOA appeals the denial of its special motion to strike the Tripodeses' complaint-in-intervention under the anti-SLAPP[1] statute (Code Civ. Proc.,[2] § 425.16), as well as the dissolution of a preliminary injunction that would have required Oswit to maintain the status quo of the property during the pendency of the case. In its view, the anti-SLAPP motion should have been granted and the injunction should have remained in place.

On its first contention, we agree with the HOA that the trial court erred in finding that the gravamen of the complaint-in-intervention did not involve protected activity under the anti-SLAPP statute. We further conclude that the Tripodeses have not shown any probability of prevailing on their claim. Accordingly, we reverse the order denying the special motion to strike the complaint-in-intervention and direct the court to grant it.

Regarding the second claim, we disagree with Oswit that the order dissolving the injunction is not appealable under the plain language of section 904.1, subdivision (a)(6), and therefore deny its motion to dismiss the appeal. On the merits, however, we conclude that the trial court correctly dissolved the injunction because the HOA failed to post the mandatory injunction bond. The HOA otherwise fails to demonstrate that the court abused its discretion in declining to reduce the bond amount, and its arguments that the court erred in setting the bond in the first place are beyond the scope of this appeal.

---

[1] "SLAPP" stands for strategic lawsuit against public participation. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 882, fn. 2 (*Wilson*).)

[2] Further statutory references are to the Code of Civil Procedure unless otherwise stated.

3

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying dispute is not particularly complicated.[3] "In its complaint filed on August 12, 2022, the HOA explains that it was designed as an integrated residential golf course community and that about a third of its 600 condominium units are situated adjacent to an 18-hole golf course. Palms Partners Capital, LLC (Palms Partners), owned by [Ramin] Saghian, acquired the Mesquite Golf & Country Club (the Club) and the golf course in 2014.[4] Thereafter, Palms Partners allegedly failed to maintain the golf course and the Club despite several notices from the HOA regarding deficiencies and dangerous conditions, which the HOA contends are lease violations and public nuisances. As a result of Palms Partners' lack of action, the HOA describes both the Club and golf course as 'not useable.'" (*Mesquite Country Club*, *supra*, D082762.)

"Oswit purchased the golf course from Palms Partners on July 26, 2022. Palms Partners retained ownership of the Club. According to the HOA's complaint, Oswit confirmed in written materials disseminated to homeowners that it would convert the golf course to a public nature preserve and botanical garden. The HOA further submits that an attorney for a principal of Oswit and one of its significant donors, The Prescott Foundation, stated that the new preserve, to be known as Prescott Preserve, will never operate as a golf course. The complaint alleges that '[s]ince its purchase of

---

[3]    This case has come before our court previously, and we take the background facts from our prior unpublished opinion. (*Mesquite Country Club Condominium Homeowners Association v. Save Oswit Canyon, Inc.* (Feb. 26, 2024, D082762) (*Mesquite Country Club*).) Additional information relevant to the specific arguments raised in this appeal will be set forth as we address those contentions.

[4]    Palms Partners and Ramin Saghian are not involved in this appeal.

the Golf Course, it appears that Oswit has completely abandoned the Golf Course and has stopped all maintenance, landscaping and irrigation, contributing to its further deterioration." (*Mesquite Country Club, supra*, D082762.)

## DISCUSSION

### A.  *The trial court should have granted the anti-SLAPP motion.*

The HOA contends the trial court erred by denying its anti-SLAPP motion to strike the Tripodeses' complaint-in-intervention, which raises a claim under the Common Interest Development Open Meeting Act (the Open Meeting Act) (Civ. Code § 4900 et seq.).  It maintains that the complaint challenges the board's vote to initiate this lawsuit, which is "a textbook example" of protected activity under the anti-SLAPP statute.  We agree the court erred in finding that the Tripodeses' claim did not arise from protected petitioning activity.  And although the court did not reach the second step in its anti-SLAPP analysis, we independently conclude that the Tripodeses have failed to show minimal merit to their claim.

#### 1.  *Anti-SLAPP Motions Generally*

"[T]he anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern.  [Citations.]  To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson, supra*, 7 Cal.5th at pp. 883–884; see § 425.16.)

5

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) "[T]he Legislature has defined such protected acts in furtherance of speech and petition rights to include a specified range of statements, writings, and conduct in connection with official proceedings and matters of public interest." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 (*Park*); see § 425.16, subd. (e).)

"If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral, supra*, 1 Cal.5th at p. 384.) The Supreme Court has described "this second step as a 'summary-judgment-like procedure.'" (*Ibid*.) "If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).) "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral*, at p. 384.)

"We review de novo the grant or denial of an anti-SLAPP motion. We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park, supra*, 2 Cal.5th at p. 1067, citations omitted.)

6

### 2.    *Additional Background*

With the trial court's permission, the Tripodeses intervened in this litigation in December 2022. According to their complaint-in-intervention, this lawsuit "was initiated by a vote of the [HOA's] board of directors without notice to, or vote or approval or consent of the homeowners." The Tripodeses more specifically alleged "that on or about July 28, 2022, the board of directors secretly authorized the filing of the suit without seeking any input from the homeowners. It was not until August 25, 2022, that the homeowners were first notified [via email] of the board's decision and that suit had been filed."

The Tripodeses agreed with Oswit that it was not required to maintain the property as a golf course under the lease or covenants, conditions, and restrictions (CC&Rs) governing the HOA and Oswit. Indeed, the Tripodeses believed that a nature preserve would enhance their property value, and that most of their fellow homeowners were similarly unopposed to the preserve. They contested the HOA using the homeowners' dues or levying any special assessments upon the homeowners to fund this litigation.

The Tripodeses sought a judgment that included the following: (1) that the HOA "take nothing by its action;" (2) that judgment be awarded in favor of Oswit; (3) "[t]hat the decision by the board of directors to initiate this litigation be declared unlawful, invalid and without authority"; (4) that the board members who authorized this lawsuit reimburse the HOA for all attorney's fees and costs incurred; and (5) that no special assessment be imposed upon the homeowners to pay for this litigation.

The HOA filed a special motion to strike the complaint-in-intervention under the anti-SLAPP statute. It contended that although the complaint did not articulate any specific cause of action, it clearly focused on the vote of the

7

HOA's board members to initiate this lawsuit, and the vote was plainly protected activity under the anti-SLAPP statute. The HOA also presented several theories on why the Tripodeses could not prevail on the merits of their claim: (1) the vote is protected by the "business judgment rule," i.e., when the board acts in good faith and in the best interests of the community, its actions are presumed to be valid; (2) neither the law nor the HOA's governing documents required it to secure the homeowners' approval before filing suit; (3) the Tripodeses lacked standing; (4) they were required to pursue alternate dispute resolution (ADR); and (5) they impermissibly sought relief against the individual board members, who are not parties to the litigation.

In their written opposition, the Tripodeses apparently agreed that "[t]he basis of the claim is the Board's decision to file this lawsuit." However, they argued the board's decision was not protected because it was made illegally. (See *Flatley v. Mauro* (2006) 39 Cal.4th 299, 305 (*Flatley*) ["a defendant whose assertedly protected speech or petitioning activity was illegal as a matter of law, and therefore unprotected by constitutional guarantees of free speech and petition, cannot use the anti-SLAPP statute"].) The Tripodeses elaborated that the board's failure to give advance notice of the meeting wherein the decision to file suit took place was a violation of the Open Meeting Act and the HOA's governing bylaws.

The Tripodeses clarified that they were pursuing their claim pursuant to Civil Code section 4955, subdivision (a), which allows "[a] member of an association" to "bring a civil action for declaratory or equitable relief for a violation of" the Open Meeting Act, "including, but not limited to, injunctive relief, restitution, or a combination thereof . . . ."

8

Since they were confident that the HOA's decision to file suit was not protected, the Tripodeses expressly chose not to discuss the probability that they would prevail on their claim, except to address the HOA's suggestion that they should submit to ADR. To that point, they argued that ADR was a moot point since the HOA had already filed suit in court.

Concurrent with their opposition, the Tripodeses submitted a declaration from Rocklen DeHoog, a former HOA board member. DeHoog stated that, on July 28, 2022, a majority of the board voted to file the lawsuit, but he voted against the motion. The Tripodeses also filed declarations stating that the HOA gave the homeowners no notice of this meeting. According to them, on August 25, 2022, the HOA sent an e-mail advising that the suit was already filed.

On reply, the HOA submitted a declaration from the HOA's longtime property manager, Bobbie Gaffney. According to Gaffney, the board held an executive session meeting via Zoom on July 25th—not July 28th—and the vote to file the lawsuit took place during that meeting. She was present and took meeting minutes. Gaffney further declared that "[a]t least two days prior to the meeting, I asked my employee Toney Campos to post the agenda for the executive session meeting on [the five common area mailboxes], in compliance with Civil Code Section 4920(b)(2). I confirmed that Mr. Campos completed the task I delegated."

Based on this declaration, the HOA insisted that they gave adequate notice. Even assuming the contrary, the failure to give notice would not strip the vote of anti-SLAPP protection, because it is not *criminal* conduct. (See *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654 ["the Supreme Court's use of the phrase 'illegal' [in *Flatley*] was intended to mean criminal, and not merely violative of a statute"].)

9

The HOA maintained that the vote to initiate the litigation constituted the critical conduct at issue and was "indisputably protected 'petitioning activity.'" The HOA also highlighted that the Tripodeses "abandoned" their burden of establishing a probability of success on the merits of their claim.

Following a hearing, the trial court denied the special motion to strike. Considering that the Tripodeses raised their claim under the Open Meeting Act, and that the declarations focused on when the board meeting took place and whether notice was given, the court found that "the gravamen of the Complaint in Intervention is not the vote of the Board but rather the failure to provide notice of the meeting wherein the Board voted to file the instant suit." Because the HOA "failed to demonstrate that the failure to provide this notice is protected activity pursuant to CCP § 425.16," the court denied the motion without assessing the probability that the Tripodeses would prevail on the merits.

The HOA filed a timely notice of appeal pursuant to section 425.16, subdivision (i).

3.     *Step one:  the Tripodeses' claim arises from protected activity.*

At the first step of the anti-SLAPP analysis, the moving party (here, the HOA) bears the burden "to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected activity." (*Bonni*, *supra*, 11 Cal.5th at p. 1009.) "Analysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief— each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected . . . ." (*Bonni*, at p. 1010; see also *Dziubla v. Piazza II* (2020) 59

10

Cal.App.5th 140, 148, fn. 4 (*Dziubla*) ["A single cause of action can incorporate more than one claim; at the same time, a single claim can sometimes form the basis for more than one cause of action"].)

"[A] claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity.  Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060.)  Courts should focus on "the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id.* at p. 1063.)

In considering a "mixed cause of action"—i.e., "relief is sought based on allegations of both protected and unprotected activity"—"the unprotected activity is disregarded at this stage." (*Baral*, *supra*, 1 Cal.5th at p. 396.) "If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached." (*Ibid.*)

Although the Tripodeses' complaint-in-intervention itself is unclear as to the asserted legal ground(s) for relief, at this point, it appears undisputed that they seek declaratory or equitable relief pursuant to the Open Meeting Act.  The specific provisions cited by the Tripodeses provide as follows: "The board shall not take action on any item of business outside of a board meeting." (Civ. Code, § 4910, subd. (a).)  Moreover, "the board may not discuss or take action on any item at a nonemergency meeting unless the item was placed on the agenda included in the notice that was distributed pursuant to subdivision (a) of [Civil Code section] 4920." (*Id.*, § 4930, subd. (a).)

11

In turn, Civil Code section 4920, subdivision (a) states that, "[e]xcept as provided in subdivision (b), the association shall give notice of the time and place of a board meeting *at least four days* before the meeting." (Italics added.) Perhaps relevant here—given Gaffney's declaration stating that the meeting at issue was an executive session meeting[5]—subdivision (b)(2) requires the association to "give notice of the time and place of the meeting *at least two days*" before a meeting held in executive session. (Civil Code, § 4920, italics added.) Subdivision (b)(3), however, creates an exception to the exception: if the association's governing documents require a longer notice period specifically for executive session meetings, those governing documents control.

And, as noted above, Civil Code section 4955, subdivision (a) allows a homeowner to "bring a civil action for declaratory or equitable relief for a violation of this article [the Open Meeting Act] by the association, including, but not limited to, injunctive relief, restitution, or a combination thereof . . . ."

As we understand the Tripodeses' claim for relief under these provisions, it is that the HOA board members discussed and/or took action on an item of business at a nonemergency meeting without distributing the required notice and agenda before the meeting. In an effort to establish this claim, the Tripodeses alleged that the board members voted to initiate the lawsuit against Oswit at a board meeting on July 28, 2022, without any prior notice to the homeowners. The trial court found that "the gravamen" of this claim was not the vote of the board, but rather the board's failure to provide notice.

---

[5]     The Open Meeting Act allows the board to meet solely in executive session to consider litigation. (Civ. Code, § 4935, subd. (a).)

12

The Supreme Court in *Bonni*, *supra*, 11 Cal.5th 995 recently clarified how the "gravamen test" may be properly employed in step one of the anti-SLAPP analysis. Looking at a so-called mixed cause of action, courts should not seek to identify "the essence or gist" of the action, then decide whether that essence or gist is protected or unprotected. (*Id.* at p. 1012.) Rather, they should "determine whether particular acts alleged within the cause of action supply the elements of a claim [citation] or instead are incidental background [citations]." (*Ibid.*) " 'The "gravamen" is defined by the *acts on which liability is based,*' " and those acts are the ones to evaluate for protection. (*Ibid.*, quoting *Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 111.) Alleged activities that are merely contextual, incidental, or collateral—i.e., that do not support a claim for recovery—are not subject to striking under the anti-SLAPP statute. (*Bonni*, at p. 1012.)

In this light, it appears the trial court found that the vote to file suit was immaterial to the Tripodeses' claim. We disagree. The claim as alleged and understood is not merely that the board held a meeting without notice, but that the board took action (i.e., voted) on an item of business (i.e., the litigation against Oswit) at a nonemergency meeting without notice. As the Tripodeses could not have made this claim without alleging that the board took some action at the meeting, the claim must be "based on" or "depend on" the allegation of the vote or decision. (*Park*, *supra*, 2 Cal.5th at p. 1068.)[6]

---

[6] In the same vein, the Tripodeses describe other acts by the HOA, such as the actual filing and prosecution of the lawsuit as well as certain e-mails to the homeowners, that allegedly took place after the vote. Because their claim for relief under the Open Meeting Act, as we understand it, does not depend on these subsequent acts, we do not consider them in deciding whether the claim arises from protected activity. (See *Park*, *supra*, 2 Cal.5th at p. 1068.)

13

We previously considered a similar issue in *Golden Eagle Land Investment, L.P. v. Rancho Santa Fe Assn.* (2018) 19 Cal.App.5th 399 (*Golden Eagle*). There, Golden Eagle and its co-plaintiff were entities planning to develop a piece of land that they owned, so they were seeking land use approvals from the county and the governing community association. (*Id.* at pp. 404–405.) The plaintiffs sued the association on numerous theories, including violation of the Open Meeting Act. (*Id.* at p. 405.) Essentially, the plaintiffs alleged that the association initially treated them favorably, but then voted at a board meeting to send a letter to the county that "doomed" their project. (*Id.* at pp. 408–411.) Golden Eagle claimed this violated section 4930, subdivision (a) of the Open Meeting Act, because no such vote was placed on the agenda for that meeting. (*Golden Eagle*, at pp. 415–416.)

The trial court denied the association's anti-SLAPP motion to strike that claim but we reversed, concluding that the communication to the county was protected conduct. (*Golden Eagle*, *supra*, 19 Cal.App.5th at p. 407.) In so holding, we rejected Golden Eagle's suggestion that the letter to the county was merely incidental to the claim. (*Id.* at p. 420.) We reasoned: "[T]he allegations in the Open Meeting Act cause of action describe a sequence of intertwined events leading up to the meeting and postdating the meeting, all within the scope of authority of the board in setting meetings on various topics relevant to community governance, and hearing from proponents and opponents of projects. The pleading cannot reasonably be read as severing out the arguably protected letter to the County as 'incidental' or 'collateral' in nature." (*Id.* at p. 421.) Here, too, we cannot separate the vote to file the lawsuit from the alleged failure to give notice.

To the extent the trial court believed the lack of notice was the defining feature of the claim, *Wilson*, *supra*, 7 Cal.5th 871 is instructive. In that case,

14

the plaintiff-employee raised several employment discrimination and retaliation claims. (*Id*. at pp. 881, 885.) The Supreme Court put to rest a line of authority holding that such claims categorically fall outside the scope of the anti-SLAPP statute because they are always premised on allegations of unprotected discrimination or retaliation. (*Id*. at p. 886.) As *Wilson* explains, this view ignores the fact that such claims must *also* be based on allegations of concrete action adverse to the employee. (*Ibid*.) If the adverse action alleged constitutes protected activity, then anti-SLAPP protections apply. (*Id*. at p. 887.) The allegations of unprotected discrimination or retaliation do not "defeat" the anti-SLAPP protection. (*Id*. at p. 886.) Applying that reasoning here, even if the Open Meeting Act claim is based in part on the failure to give adequate notice, an unprotected activity, it remains true that the claim is *also* based on the vote or decision to file suit.

Thus, the question becomes whether the vote or decision to sue Oswit constitutes protected activity. Again, the HOA bears the burden to show how this activity fits within at least one of the four categories set forth in section 425.16, subdivision (e). (*Bonni, supra*, 11 Cal.5th at p. 1009.) The HOA invokes two of these categories— section 425.16, subdivision (e)(3), which protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest"—and subdivision (e)(4), which protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." The HOA has met its burden under section 425.16, subdivision (e)(4).[7]

---

[7] Since the HOA only needed to show that the vote fell within at least one of the four categories of protected activity (see *Wilson, supra*, 7 Cal.5th at p. 884), we do not need to analyze protection under section 425.16, subdivision (e)(3).

We easily conclude that a decision or vote to file a lawsuit is "conduct in furtherance of the constitutional right of petition" under section 425.16, subdivision (e)(4). (See *Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1106 [interpreting "in furtherance of" to mean " 'advance or assist' "]; *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1087 ["It is well established that filing a lawsuit is an exercise of a party's constitutional right of petition"].) As to whether this vote or decision concerned "a public issue or an issue of public interest," we reiterate the observation that " 'several courts have found protected conduct in the context of disputes within a homeowners association,' by utilizing the 'public interest' category in the statute, section 425.16, subdivision (e)(4) . . . ." (*Golden Eagle*, *supra*, 19 Cal.App.5th at p. 418; see also *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 131–132 (*Colyear*) [surveying cases].)

"In anti-SLAPP analysis, the term ' "public interest" ' as found in section 425.16, subdivision (e)(4) includes, 'in addition to government matters, " 'private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity.' " [Citations.] "[I]n cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging participation in matters of public significance." ' " (*Golden Eagle*, *supra*, 19 Cal.App.5th at pp. 418–419.)

To illustrate, in *Colyear*, *supra*, 9 Cal.App.5th 119, a homeowner submitted a written application to have his homeowners association trim his neighbor's trees that were obstructing his view. (*Id*. at pp. 123, 126.)

16

Ostensibly, this was a private dispute between two individual neighbors, but the appellate court concluded this actually concerned the public interest. (*Id*. at p. 123.) The record in that case showed, at the time the homeowner submitted his application, there was an ongoing debate regarding the association's authority to enforce tree-trimming covenants on the various lots within the community, resulting in multiple hearings, letters, and several changes to the board's policy. (*Id*. at pp. 132–133.) The application struck at the heart of this dispute, because his neighbor's lot was one of many that did not appear subject to the tree-trimming covenants. (*Id*. at pp. 125, 133.) Indeed, it was undisputed that the association's "authority to apply tree-trimming covenants to all lots in the community [was] a subject of interest to the entire membership of the community." (*Id*. at p. 133.)

Similarly in *Lee v. Silveira* (2016) 6 Cal.App.5th 527 (*Lee*), three board members of a homeowners association sued six fellow members over the majority's vote to renew a property manager's contract and to approve a roofing project. (*Id*. at pp. 530–535.) We held the "director defendants' decisionmaking process and debate in approving both the roofing project, which affected multiple buildings in [the community], and the [property] management contract, which management entity was responsible for the day-to-day operations of" the association and community" "impacted a broad segment, if not all, of [association] members" and thus concerned matters of "public interest" for purposes of the anti-SLAPP statute. (*Id*. at p. 540.)

As in those cases, the record here shows that, by the time the HOA voted to sue Oswit, the deteriorating golf course was the subject of ongoing discussion and debate within the community. According to a declaration from property manager Gaffney, filed with the HOA's motion to strike, the board had been holding "meetings to discuss the condition of the Golf Course

17

and the clubhouse, its rights under the 1984 Lease and the CC&Rs, the potential sale of the Golf Course, Oswit's decision to close the Golf Course and Oswit's threats to convert it to a wilderness preserve" over a series of board meetings starting in January 2020.

The controversial nature of the decision to sue Oswit is further shown by the fact that one board member, DeHoog, voted against the lawsuit, as well as the Tripodeses' own complaint, which asserts that they and other homeowners do not agree with the lawsuit. (Cf. *Lee*, *supra*, 6 Cal.App.5th at p. 542 ["the acts complained of by plaintiffs . . . involved director defendants' decisionmaking on 'public issues' (i.e., the roofing project and the [property] management contract) that *divided* the board"].)

Moreover, the fate of the golf course property at the center of this community will affect the hundreds of Mesquite homeowners, one way or the other, whether in terms of the use and enjoyment of the space or the value of their homes. To the extent the litigation will financially drain the HOA, the homeowners could be affected in that respect as well. In light of this record, we find it indisputable that the vote concerned the public interest. We therefore proceed to step two.

4.     *Step two:  the Tripodeses did not carry their burden of establishing the minimal merit of their claim.*

At the second step, "the burden shifts to the plaintiff [here, the Tripodeses] to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint,

18

unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral*, *supra*, 1 Cal.5th at p. 396.)

Since the trial court denied the HOA's anti-SLAPP motion at the first step, it did not reach the second step. In this circumstance, we have the discretion to remand for the trial court to decide the second step in the first instance or, given the independent standard of review, make the determination ourselves. (*Golden Eagle*, *supra*, 19 Cal.App.5th at p. 422.)

In this case, we choose to exercise our independent review and conclude that the Tripodeses have failed to carry their burden. In their responding brief, their argument at the second step of the analysis is this:

> "If one questions whether or not the first prong was met, the question would be whether or not [interveners] have satisfied the minimal-merit requirement. They have. The intervention complaint alleges the lack of notice and the breach of fiduciary duties, either of which supports 'a sufficient prima facie [showing] of facts to sustain a favorable judgment if the evidence submitted by [interveners] is credited.' "

The Tripodeses' response is plainly insufficient. They continue to make no effort to relate their submitted declarations to the elements of their claim. (See *Golden Eagle*, *supra*, 19 Cal.App.5th at p. 413 ["The plaintiff may not rely solely on the pleading's allegations to establish that the claims have ' "minimal merit" ' "].) They likewise fail to address the HOA's various arguments as to why they cannot prevail on the merits, raised in the trial court and again on appeal. (*Dziubla*, *supra*, 59 Cal.App.5th at p. 154 ["plaintiffs must demonstrate the 'minimal merit' of their claims" *and* must "show they can overcome any affirmative defense defendant has raised"].) "We need not consider such a perfunctory assertion unaccompanied by supporting argument." (*People v. Smith* (2003) 30 Cal.4th 581, 616, fn. 8.)

19

Because the Tripodeses have failed to carry their burden, we will reverse and remand with directions for the trial court to grant the HOA's special motion to strike the complaint-in-intervention.[8] (See *Golden Eagle*, *supra*, 19 Cal.App.5th at p. 423.) They offer no reason—let alone a compelling one—why they should be given a third bite at the apple.

**B.** ***The trial court properly dissolved the preliminary injunction because the HOA failed to post the required bond.***

The HOA also appeals from an order dissolving a preliminary injunction that would have required Oswit to maintain the golf course during the pendency of the case. The trial court initially granted the injunction on the condition that the HOA post a $5 million bond, which would compensate Oswit if it turned out that the injunction was improvidently granted. When the HOA was unable to secure the bond, it asked the court to reduce the bond. The court declined the request and dissolved the injunction. Now, the HOA argues the court abused its discretion in dissolving the injunction and in setting the bond at $5 million in the first place. Oswit contends we must dismiss this appeal because the order at issue is not appealable. Alternatively, it argues that the court correctly dissolved the injunction.

---

[8] In their brief, the Tripodeses argue that the public interest exception to the anti-SLAPP statute (§ 425.17) applies here. We do not consider this argument because it was not raised in the trial court. (See *Cordoba Corp. v. City of Industry* (2023) 87 Cal.App.5th 145, 154 ["We generally will not consider an argument or theory raised for the first time on appeal"].) They also suggest that their complaint-in-intervention alleges a distinct claim for breach of fiduciary duty. We decline to analyze whether this claim can survive the anti-SLAPP motion as the issue was not made clear in the trial court or developed in the briefing in this court. We note, however, that any claim for breach of fiduciary duty also appears dependent on the protected activity of voting to file the lawsuit.

20

We conclude we have jurisdiction to consider this appeal, but agree that dissolution of the injunction was proper.

1.    *Additional Background*

Shortly after filing its complaint, the HOA filed a motion for a preliminary injunction to prohibit Oswit from:  (1) refusing to maintain, landscape, or water the golf course property as required by law, the CC&Rs, and the Lease; and (2) making any material changes to the golf course and its related facilities or operations, including any attempt to convert the property to another use.  Broadly, the HOA argued an injunction was necessary to preserve the status quo while the case proceeded because, otherwise, the homeowners would suffer lost property value in their homes, as well as severe health and environmental harms.  Moreover, if the plan to transform the golf course property into a nature preserve were allowed to move forward, the property would be irreversibly destroyed.

In opposition, Oswit asserted, in part, that the HOA could not show a likelihood of success on the merits of their various claims, or proof of imminent harm to the homeowners.  Oswit posited that neither the CC&Rs nor the Lease required it to operate a golf course, and it did not cause the unfortunate condition of the property.  In fact, Oswit maintained it had improved the property since taking ownership.

As relevant here, if the trial court was inclined to grant the injunction, Oswit requested that the HOA post a bond in the amount of $14,152,000, calculated as follows:  the purchase price of the property ($8,750,000), plus two years of operational costs ($62,500[9] x 24 = $1,500,000), plus public and

_____

[9]    This number was an estimate, referencing a declaration from Oswit's founder and president stating that, between July 22 and September 11, 2022, Oswit spent $78,447.12 to operate Prescott Preserve.

private grants and fundraising ($3,500,000), and two years of defense costs ($402,000).

In response, the HOA emphasized that Oswit's plans to "rewild" the property—which would involve introducing native animals such as wolves, mountain lions, coyotes, and rattlesnakes to the area—threatened the health and safety of the homeowners. Regarding the bond, the HOA specifically challenged the purchase price of the property ($8,750,000) and the operating costs ($1,500,000), reasoning that an injunction would not render the property totally valueless, and Oswit must pay its operating costs regardless. The HOA also challenged the attorney's fees ($402,000) "because even if Oswit ultimately overcomes an injunction, the [HOA] would still be entitled to monetary damages." The HOA requested a "minimal" bond amount of $50,000; it did not explain how it chose that number.

At a hearing, the trial court expressed that it was "on the fence" about granting the preliminary injunction, but ultimately decided it would grant the injunction with a $5 million bond. However, the court found the proposed injunction was vague and overbroad, so it directed the HOA to prepare a revised order that simply required Oswit to maintain the property as it was upon purchase, in language agreed to by Oswit.

The HOA asked the court to consider reducing the amount of the bond, highlighting its arguments regarding the purchase price and the operating costs. The HOA added that $5 million was "a very significant financial burden for" it. The court denied the request, explaining that requiring Oswit to maintain the property as a golf course "pending the outcome of the lawsuit does cause damage," as shown in its declarations. The court characterized the HOA's request for a $50,000 bond as "ridiculously low, because the cost

of them just maintaining this as a golf course exceeds that $50,000 when we get probably to month two."

On January 13, 2023, the trial court issued the injunction, ordering Oswit to maintain the status quo of the golf course property as it existed on the date of the hearing.[10] The court ordered the injunction effective upon the HOA filing a bond in the amount of $5 million.

Less than two weeks later, the HOA filed a motion to reduce the bond from $5 million to $1 million. The HOA explained that after the injunction hearing, it "diligently tried to obtain a bond from various surety companies and insurance brokers, but soon discovered that no bond underwriter would issue such a large bond to the Association because it lacks sufficient assets to collateralize such a bond, due to its 'non-profit' status and current financial condition." The HOA was advised that it would need to deliver $5 million in cash collateral to the surety company, or obtain a letter of credit for the benefit of the surety, which would require cash collateral in the same amount. The HOA determined it could not obtain a bond above $1 million. In any event, the HOA asserted, there was no evidentiary basis for a $5 million bond.

As authority for its request, the HOA relied on sections 533, 996.030, and 1008. As to section 533, the HOA claimed that "the ends of justice would be served" by decreasing the bond because, otherwise, the injunction would become "useless." Citing section 996.030, the HOA argued that the bond was excessive because "the only category of damages that Oswit arguably could incur if this injunction were overturned are the costs directly associated with

---

10    The trial court crossed out language in the proposed order requiring Oswit to maintain the property as it was upon purchase, and wrote in the date of the injunction hearing instead.

litigation related to the injunction, all of which is completely speculative at this time." Under section 1008, subdivision (a), the HOA asserted that reconsideration of the bond amount was justified because: "(1) it has become apparent that it is impossible for the Association to obtain a $5,000,000 bond, and (2) Oswit has made changes to the Golf Course property since July 22, 2022 that are not consistent with the 'status quo' on the date it purchased the Property, and has clearly demonstrated its intent to continue to do so in the near future."[11] The HOA reiterated its arguments that the purchase price and operating costs of the property should not factor into the bond amount; that Oswit's loss of grants and donations were purely speculative; and its attorney's fees were speculative and overstated.

Oswit opposed the motion, arguing that the HOA was seeking "another bite at the proverbial apple" since the bond amount was already litigated at the injunction hearing. Oswit insisted that a $1 million bond would be insufficient. It already produced evidence of "$3 million of actual out of pocket damages (unpaid rent, property operating costs, loss of tree donations, [a restoration] contract, attorney's fees) and a further $10–15 million of grants that are frustrated by the" litigation. It suggested that the HOA was not entitled to use sections 533 or 996.030 to reduce the bond, because it had failed to post any bond in the first place. Oswit also asserted that reconsideration under section 1008 was not warranted because the HOA did not present new or different facts; it was surely aware of its own finances at the initial injunction hearing.

---

11    This latter point appears relevant to the HOA's additional request for the court to modify the injunction to require Oswit to revert the golf course to its condition upon purchase. Of course, this became a moot point when the court dissolved the injunction.

On reply, the HOA insisted that reconsideration of the bond was appropriate because "[n]o one realized" at the time the injunction was granted that the bond condition "was impossible to fulfill."

The trial court heard and denied the motion on February 28, 2023. It reasoned that the HOA's nonprofit status and financial condition did not constitute "new evidence" within the meaning of section 1008, subdivision (a) and the HOA otherwise failed to present new facts or authorities meriting reconsideration of the bond amount. The HOA simply repeated arguments that the court already considered in setting the bond.

When the HOA pressed the court to reevaluate its ruling under sections 533 and 996.030, the court confirmed that it considered those provisions as well but decided "the easiest way to address it was under" section 1008 "because there were no new facts or law that were brought up here." The court reiterated that "it was a close call" on whether it would grant the injunction in the first place, because it doubted whether the HOA could prevail on the merits. And even though Oswit submitted evidence showing their potential harm could exceed $5 million, the court "deemed that as a reasonable amount" for a bond. Since the injunction was predicated on the bond, and the HOA could not post the bond, the court ordered that "the preliminary injunction is dissolved."

On March 1, 2023, the HOA filed a notice of appeal from the court's February 28 order.

2. *Preliminary Injunction Bonds Generally*

Section 529, subdivision (a) states: "On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the

25

injunction, if the court finally decides that the applicant was not entitled to the injunction. . . . If the court determines that the applicant's undertaking is insufficient and a sufficient undertaking is not filed within the time required by statute, the order granting the injunction must be dissolved."

The courts have interpreted this provision to mean that, generally, the party seeking an injunction must post an undertaking or a bond[12] in order for the injunction to become valid. (See, e.g., *Stevenson v. City of Sacramento* (2020) 55 Cal.App.5th 545, 551 (*Stevenson*) [compliance with § 529 "is typically a necessary condition to obtain a valid preliminary injunction"]; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1024 [the undertaking is required to "perfect" the preliminary injunction]; *ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 10 (*ABBA Rubber*) ["an injunction does not become effective until an undertaking is required and furnished"]; *Oksner v. Superior Court In and For Los Angeles County* (1964) 229 Cal.App.2d 672, 687 ["Without the bond a preliminary injunction is a nullity"].)

The purpose of the bond is to afford compensation to the enjoined party if it turns out that the injunction was improvidently granted. (*City of South San Francisco v. Cypress Lawn Cemetery Assn.* (1992) 11 Cal.App.4th 916, 922; *ABBA Rubber*, *supra*, 235 Cal.App.3d at p. 14.) The trial court sets the amount of the bond in its discretion by estimating the damages the enjoined party will likely suffer due to the injunction. (*ABBA Rubber*, at p. 14.) Typically, when the court grants a preliminary injunction, "a proposed order

---

12     A "bond" is executed by both the principal and sureties (§ 995.140, subd. (a)), whereas an "undertaking" is executed by the sureties alone (§ 995.190). These terms are often used interchangeably. Generally, if a statute requires an undertaking, a bond may be given instead, and vice versa. (§ 995.210.) The parties used the term "bond" in the trial court and in this court. For consistency and simplicity, we will use that term as well.

must be presented to the judge for signature, with an undertaking in the amount ordered, within one court day after the granting of the application or within the time ordered."  (Cal. Rules of Court, rule 3.1150(f).)

On noticed motion, or on its own motion, the court may later increase (§ 996.010) or decrease (§ 996.030) the amount of the bond if it finds that the amount is insufficient or excessive.  (See *Stevenson, supra,* 55 Cal.App.5th at p. 554 ["The Bond and Undertaking Law (§ 995.010 et seq.) generally governs all bond and undertaking requirements, including those in section 529"].)

3.     *Our Jurisdiction to Consider the HOA's Appeal*

As a threshold matter, Oswit contends we lack jurisdiction to consider the HOA's appeal.  The HOA claims appealability under section 904.1, subdivision (a)(6), which provides that an appeal may be taken from "an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction."  It points to the fact that the trial court, after declining to reduce the bond, affirmatively dissolved the injunction.  In response, Oswit asserts this section does not apply.  Because the HOA never posted the injunction bond, the injunction never took effect and never existed as a matter of law.  "The trial court's recognition of this fact and clarification that there was no injunction was not immediately appealable as a grant or denial of a preliminary injunction under [section] 904.1(a)(6)."  In Oswit's view, what the HOA is "actually appealing" is the trial court's denial of its motion to reduce the bond, which is not separately appealable.  Oswit urges us to dismiss the HOA's appeal.

"A reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment."  (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696.)  "A trial court's order is appealable when it is made so by statute."  (*Ibid*.)  "With certain exceptions

27

not pertinent here, appealable judgments and orders are listed in Code of Civil Procedure section 904.1." (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19.)  As noted above, section 904.1, subdivision (a)(6) permits an appeal from "an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction."

Oswit mainly relies on *County of Los Angeles v. City of Los Angeles* (1999) 76 Cal.App.4th 1025 (*County of Los Angeles*), but that case does not supply all the answers here.  *County of Los Angeles* involved two appeals. In the first, the defendant appealed from an order granting a preliminary injunction, arguing that the trial court wrongly granted the injunction and set the amount of the bond too low.  (*Id*. at p. 1026.)  The Court of Appeal had no doubt that it had jurisdiction to consider the sufficiency of the bond in that appeal because section 904.1, subdivision (a)(6) explicitly permits an appeal from an order granting an injunction, and the amount of the bond "certainly" affected that order.  (*County of Los Angeles,* at pp. 1027–1028, citing § 906 [upon an appeal pursuant to § 904.1, the appellate court may review any "order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party"].)  On the merits in the first appeal, the appellate court affirmed the order granting the injunction.  However, it agreed that the amount of the bond was insufficient, so it reversed the order setting the amount of the bond and remanded for a redetermination.  (*Ibid*.)

On remand, the trial court increased the bond, but the defendant remained dissatisfied, and so it appealed again.  (*County of Los Angeles*, *supra,* 76 Cal.App.4th at p. 1027.)  This time, the Court of Appeal concluded that the order fixing the amount of the bond was "not separately appealable as matters now stand."  (*Id*. at p. 1026.)  The appellate court's reasoning was

28

simple: "section 904.1 does not list an order setting the amount of a preliminary injunction undertaking as an appealable matter." (*Id*. at p. 1028.) It therefore dismissed the appeal. (*Id*. at p. 1029; accord, *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1061 (*Oiye*) ["An order setting the amount of the bond is not independently appealable [citation], but it may be reviewed on appeal from the issuance of the injunction"]; *Committee to Support Recall of Gascón v. Logan* (2023) 94 Cal.App.5th 352, 372 [a "postinjunction order setting an amount of bond amount is not separately appealable"].)

We agree with the HOA that *County of Los Angeles* is distinguishable. Unlike the second appeal in that case, the HOA does not appeal from a standalone order setting, increasing, or decreasing the bond amount. Rather, it appeals an order dissolving an injunction based on its failure to post the bond, which was, of course, tied to the court's refusal to decrease the bond. We are not aware of any cases discussing appealability in this seemingly unusual procedural posture. Accordingly, to decide whether this is an appealable order, we will examine section 904.1 directly.

In construing statutes generally, "we ascertain the Legislature's intent in order to effectuate the law's purpose. We must look to the statute's words and give them their usual and ordinary meaning. The statute's plain meaning controls the court's interpretation unless its words are ambiguous. If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent." (*Green v. State of California* (2007) 42 Cal.4th 254, 260, citations omitted.)

Here, upon confirming that the HOA could not post the required $5 million bond and declining to reconsider the amount of the bond, the trial court expressly ordered the preliminary injunction dissolved. The plain language of section 904.1, subdivision (a)(6) authorizes an appeal "[f]rom

29

an order . . . dissolving an injunction." Given this unambiguous language, we have no difficulty concluding that the court's February 28, 2023, order dissolving the injunction is appealable.

Oswit essentially asks us to read a limitation into the statute that is not there—namely, that an order dissolving an injunction is appealable under some circumstances, but not when the injunction is dissolved due to the failure of the applicant to post the requisite bond. As a reviewing court, we "may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543.) Moreover, the Supreme Court has " 'repeatedly held that if the Legislature intends to abrogate the statutory right to appeal, that intent must be clearly stated.' " (*In re S.B.* (2009) 46 Cal.4th 529, 537.) There is simply no such limitation on the right to appeal from an order dissolving an injunction written into the statute.

Oswit emphasizes that because the HOA never posted the bond, the injunction never took effect. To be sure, absent the necessary bond an injunction is inoperative such that the enjoined party cannot be held in contempt for violating the injunction. (*Condor Enterprises, Ltd. v. Valley View State Bank* (1994) 25 Cal.App.4th 734, 741; *Griffin v. Lima* (1954) 124 Cal.App.2d 697, 699–700.) But we cannot agree with Oswit that the lack of a bond meant the injunction "did not exist as a matter of law." (Italics omitted.) If it did not exist—albeit in an ineffective form—there would be nothing to dissolve. Section 529, subdivision (a) states that if "a sufficient undertaking is not filed within the time required by statute, the order granting the injunction *must be dissolved*" (italics added), implying action by the court. It does not say that if a bond is not filed, the injunction *is dissolved* by operation of law.

Indeed, the courts have long recognized that an injunction must be dissolved even if it is ineffective due to the lack of a bond.  For instance, in *Neumann v. Moretti* (1905) 146 Cal. 31, the trial court granted a preliminary injunction barring the defendant from assigning, transferring, or disposing of a promissory note and mortgage that was the subject of the dispute.  (*Id.* at p. 32.)  The defendant moved to dissolve the injunction on the ground that the court failed to require a bond.  (*Ibid.*)  The court denied the motion and the defendant appealed.  (*Ibid.*)  At the outset of its opinion, the Supreme Court noted that "[a]n appeal lies from an order refusing to dissolve an injunction." (*Ibid.*, citing former § 963, subd. 2.)  It then held, under section 529, the trial court had a duty to require a bond, "and the injunction will be dissolved in case of such failure to give the undertaking." (*Neumann,* at p. 32.)  Notably, the Supreme Court rejected the idea that dissolution was unnecessary simply because the injunction "would be inefficient" absent the bond.  (*Id.* at p. 33.) This may provide a defense in contempt proceedings, "but if the injunction was improperly issued without complying with the statute the defendant has the right to have it dissolved."  (*Id.* at pp. 33–34; see also *Casitas Inv. Co. v. Charles L. Harney, Inc.* (1962) 203 Cal.App.2d 811, 815 ["The rule is well established that a temporary injunction issued pending final determination of a cause must be supported by a bond or undertaking and, in the absence of such a bond, must be dissolved upon application of the party enjoined"].)

Consistent with this longstanding precedent, we will not read section 529 as indicating that a preliminary injunction is deemed to have never existed when the applicant fails to file the requisite bond, such that any subsequent dissolution is legally meaningless and nonappealable.

31

4. *The trial court properly dissolved the injunction.*

Though we consider the trial court's order dissolving the preliminary injunction to be appealable, we see no error in the court's decision.

When the HOA advised the trial court that it would not be able to post the required bond, the court had no choice but to dissolve the injunction. As explained above, upon granting a preliminary injunction, the court "*must* require an undertaking on the part of the applicant." (§ 529, subd. (a), italics added.) "That duty is *mandatory*, not discretionary." (*ABBA Rubber*, *supra*, 235 Cal.App.3d at p. 10, italics added.) "[A]n injunction does not become effective until an undertaking is required and furnished [citation], *and must be dissolved* if an undertaking is not filed within the time allowed by statute (§ 529, subd. (a))." (*ABBA Rubber*, at p. 10, italics added.)

To the extent the HOA asked the trial court to reconsider or reduce the amount of the bond pursuant to sections 533, 996.030, and/or 1008, subdivision (a), the court acted well within its discretion by declining to do so. Section 533 gives the court authority to modify or dissolve an injunction "upon a showing that there has been a material change in the facts upon which the injunction . . . was granted, that the law upon which the injunction . . . was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction." Section 1008, subdivision (a) similarly allows "any party affected by" a court order to file an application asking the court "to reconsider the matter and modify, amend, or revoke the prior order," provided the request is "based upon new or different facts, circumstances, or law." And, under section 996.030, in any case where "a bond is given or ordered," the court "may determine that the amount of the bond is excessive and order the amount reduced to an amount that in the discretion of the court . . . appears proper under the circumstances . . .

32

is subject to any limitations in the statute providing for the bond." (*Id.*, subd. (a).)[13]

We review a decision under any of these provisions for abuse of discretion. (See *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1505–1508 [applying abuse of discretion standard to § 533]; *Wilson v. La Jolla Group* (2021) 61 Cal.App.5th 897, 921 [same regarding § 1008, subd. (a)]; § 996.030, subd. (a) [the court "may determine that the amount of the bond is excessive and order the amount reduced to an amount *that in the discretion of the court* or officer appears proper under the circumstances" (italics added)].)

The thrust of the HOA's motion was that the court should reduce the bond because it could not find a surety that would secure a $5 million bond without cash collateral in the same amount, which the HOA did not have. The trial court justifiably found that the HOA's nonprofit status and financial condition was nothing new. Indeed, concurrent with its motion to reduce the bond, the HOA filed a "fund balance sheet" and a "reserve study" detailing its finances. Those documents were both prepared *before* the hearing granting the preliminary injunction and setting the bond amount. At the hearing, the HOA expressly advised the court that a $5 million bond would be "a very significant financial burden for" the association.

---

13    The HOA insists that the trial court failed to consider its argument under section 996.030, but the record shows otherwise. At the motion hearing, the court expressly confirmed that it considered sections 533 and 996.030. While the court focused its analysis on section 1008, we review the trial court's decision, not its reasoning. (See *Howard v. Thrifty Drug & Discount Stores* (1995) 10 C4th 424, 443 ["[E]ven if there is no indication of the trial court's rationale for dismissing an action, the court's decision will be upheld on appeal if reasonable justification for it can be found. 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion" ' "].)

While the HOA did not realize it would be unable to procure the bond until after the hearing, this was immaterial to fixing the amount of the bond. Again, the purpose of the bond was to compensate Oswit in the event it was wrongly enjoined. The bond amount needed to be a reasonable estimation of the damages Oswit would likely suffer as a result of the injunction. (See *ABBA Rubber*, *supra*, 235 Cal.App.3d at p. 14.) The court was not required to reduce the bond amount based on the HOA's ability to pay.[14] Otherwise, we agree with the trial court that the HOA simply repeated its arguments that the court considered in setting the bond amount in the first place, such as its challenges to the operating costs and attorney's fees.

We cannot say the trial court exceeded the bounds of reason in implicitly rejecting the HOA's broader argument that " 'the ends of justice would be served' " by reducing the bond because, otherwise, the injunction would become "useless." (See § 533 [the court may modify or dissolve an injunction "upon a showing that . . . the ends of justice would be served by the modification or dissolution of the injunction"].) At both the injunction hearing and the bond hearing, the court expressed uncertainty as to whether it should grant the injunction at all, because it doubted that the HOA could prevail on the merits. Nevertheless, it granted the injunction and set the bond at $5 million, an amount it deemed fair even though Oswit submitted evidence showing that its potential damages could well exceed that amount.

---

14 The Bond and Undertaking law gives courts discretion to "waive a provision for a bond in an action or proceeding and make such orders as may be appropriate as if the bond were given, if the court determines that the principal is unable to give the bond because the principal is indigent and is unable to obtain sufficient sureties, whether personal or admitted surety insurers." (§ 995.240.) The HOA made no attempt to invoke this provision.

34

Given these remarks, we appreciate why the court was not inclined to reduce the bond any further.

The HOA maintains that the trial court abused its discretion in setting the bond at $5 million in the first place, because that amount was not supported by the evidence. This issue is outside the scope of this appeal. As the parties seem to recognize, the HOA could have raised this claim in an appeal from the order granting the injunction and setting the bond at $5 million. (See *County of Los Angeles*, *supra*, 76 Cal.App.4th at p. 1028 ["The amount of the bond certainly was a matter which affected the 'order' under review imposing a preliminary injunction; hence, we could reach the question of the propriety of the amount of the undertaking"]; *Oiye*, *supra*, 211 Cal.App.4th at p. 1061 ["An order setting the amount of the bond is not independently appealable [citation], but it may be reviewed on appeal from the issuance of the injunction"]; see, e.g., *Stevenson*, *supra*, 55 Cal.App.5th at pp. 549–551 [plaintiffs appealed an order granting a preliminary injunction, "alleging the trial court wrongly required them to post an undertaking in connection with the injunction"].) But the HOA did not appeal the January 13, 2023, order issuing the injunction and setting the bond.[15]

---

[15] While the HOA does not make this particular point, we note that the HOA filed its notice of appeal from the order dissolving the injunction on March 1, 2023, which was still within 60 days from the order issuing the injunction and setting the bond. However, we cannot construe the notice of appeal to include this earlier order, which was not mentioned in the notice. (See *Colony Hill v. Ghamaty* (2006) 143 Cal.App.4th 1156, 1171 [" ' "[W]here several judgments and/or orders occurring close in time are separately appealable . . . , each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal— in order to be reviewable on appeal" ' "]; cf. *In re J.F.* (2019) 39 Cal.App.5th 70, 73, 75 [although a notice of appeal was filed less than 60 days from an earlier order, the appellate court could not construe the notice to embrace that order where the notice only identified a later order].)

The HOA asserts that section 906 allows us to review "the closely related question of whether the trial court abused its discretion in setting" the bond. Section 906 generally allows appellate courts to review "any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party . . . ." But critically, section 906 also states: "The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken." In other words, if an earlier ruling was appealable, the failure to appeal forfeits review of that ruling. The issue may not be revived in a subsequent appeal. (*In re Baycol Cases I & II* (2011) 51 C4th 751, 761, fn. 8.)

Accordingly, because the propriety of the amount of the bond could have been raised in an earlier appeal, we may not review that issue in this appeal. This appeal is limited to the issue of whether the trial court properly dissolved the injunction, a question we have answered in the affirmative. (Cf. *People ex rel. Feuer v. Progressive Horizon, Inc.* (2016) 248 Cal.App.4th 533, 538–539 ["Because defendants did not appeal the order granting the preliminary injunction, the only issue before us is whether the trial court erred when it denied defendants' motion to dissolve the injunction"].)

The HOA suggests that because section 996.030 gives trial courts broad discretion to reduce the amount of a bond, the HOA legitimately reargued that $5 million was unsupported by the evidence, and thereby resurrected this issue for appeal. But regardless of which statute the argument was based on, repeating the same challenges to the damages Oswit claimed it would likely suffer due to the injunction is, effectively, a request for reconsideration. (See *Powell v. County of Orange* (2011) 197 Cal.App.4th 1573, 1577 (*Powell*) ["The name of a motion is not controlling, and, regardless

36

of the name, a motion asking the trial court to decide the same matter previously ruled on is a motion for reconsideration"].) We believe this is what the trial court meant when the HOA asked it to "reevaluate its ruling under [sections] 533 and 996.030" and it said: "I actually considered this under both of those. I thought the easiest way to address it was under [section 1008], because there were no new facts or law there were brought up here."

The denial of a motion for reconsideration is not separately appealable because " ' "to hold otherwise would permit, in effect, two appeals for every appealable decision and promote the manipulation of the time allowed for an appeal." ' " (*Powell, supra*, 197 Cal.App.4th at p. 1577.) The HOA's reading of section 996.030 would similarly give litigants multiple opportunities to make the same insufficient evidence argument on appeal, a proposition unsupported by any authority of which we are aware.

## DISPOSITION

With respect to the appeal from the order denying the HOA's anti-SLAPP motion, the order is reversed with directions to grant the motion to strike the complaint-in-intervention. The HOA is entitled to its costs arising from this appeal only. As to the appeal from the order dissolving the preliminary injunction, Oswit's motion to dismiss the appeal is denied, the order is affirmed, and Oswit is entitled to its costs on appeal.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

37